# DOYLE *v.* UNION PACIFIC RAILWAY COMPANY.

## SAME *v.* SAME.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

Nos. 100, 101. Argued January 3, 1893. — Decided January 23, 1893.

An agreement between a railroad company and an individual that the latter shall occupy a section-house of the company, and shall board there the section hands and other employés of the company at an agreed rate, the company to aid in collecting the payment out of the wages of the employés, does not create the relation of master and servant between the company and the individual, but does create a tenancy terminable at the will of the company.

In the absence of fraud, misrepresentation or deceit, a landlord is not responsible for injuries happening to his tenant by reason of a snow-slide or avalanche.

It is not reversible error in a judge of a Federal Court to express his own opinion of the facts, if the rules of law are correctly laid down, and if the jurors are given to understand that they are not bound by such expressions of opinion.

THE case is stated in the opinion.

*Mr. T. M. Patterson* for plaintiff in error.

*Mr. John F. Dillon,* (with whom was *Mr. Harry Hubbard* on the brief,) for defendant in error.

MR. JUSTICE SHIRAS delivered the opinion of the court.

In the early part of November, A. D. 1883, Marcella Doyle, a widow, with a family of six children, agreed with the Union Pacific Railway Company to occupy the company's section-house, situated on the line of the railroad at or near Woodstock, in the county of Chaffee and State of Colorado, and to board at said section-house such section hands and other employés of the company as it should desire, at the rate of four and one half dollars per week, to be paid by the persons so to be boarded, and the company agreed to aid her in collecting her pay for such board by retaining the same for her out of the wages of the employés so to be boarded.

Mrs. Doyle moved with her children into the section-house, and continued in the discharge of her duties as boarding-house keeper until the 10th day of March, A. D. 1884, when a snow-slide overwhelmed the section-house, injured Mrs. Doyle, and crushed to death the six children residing with her.

Subsequently, Marcella Doyle brought, in the Circuit Court of the United States for the District of Colorado, two actions against the Union Pacific Railway Company, one for her personal injuries, the other for damages suffered by her in the loss of her children, and which latter action was based on a statute of the State of Colorado.

The actions resulted in verdicts and judgments in favor of the defendant company, and the cases have been brought to this court by writs of error. As the cases turn upon the same facts and principles of law, they can be disposed of together.

The record discloses that the facts of the case, as claimed by the respective parties, and certain admissions by the defendant company, were stated in a bill of exceptions, and upon which instructions by the court were given which are made the subject of the assignments of error.

The bill of exceptions was as follows :

" Be it remembered that on the trial of this cause, at the

November term A. D. 1886, of the said Circuit Court, the defendant admitted, and such admissions were received in evidence before the jury —

" That the plaintiff was at the several times named in the complaint a widow and the mother of the said Martin Doyle, Andrew Doyle, Christopher Doyle, Catharine Doyle, Marcella Doyle and Maggie Doyle, mentioned and named in the complaint as the children of the plaintiff, and as having each and all been killed by a snow-slide at Woodstock, in the month of March, A. D. 1884.

" That her husband and the father of said children had died previously to their death; that each of said children was of the age and sex stated in the complaint; was each unmarried and had no child nor children, and had each lived with their said mother, making their home with her up to the time of their death, and were each then living with the plaintiff, aiding and assisting her in and about making a living, and in about her duties and labors in the keeping of the section-house of the defendant at Woodstock, in the county of Chaffee and State of Colorado, where said children were killed ; that said children were all killed while in said section-house, on the 10th day of March, A. D. 1884, by a snow-slide, which then and there occurred from the mountain side above said section-house; that said section-house was built and used by the defendant as and for a section-house and a place at which the section hands of the defendant, who should work on said section, could board and lodge.

" That on or about the 5th day of November, A. D. 1883, at the instance and request of the defendant and for the mutual benefit of herself and the defendant, the plaintiff undertook and agreed with the defendant to keep for it, during its will and pleasure, its section-house situated at or near Woodstock, on the line of its railroad, in the county of Chaffee and State of Colorado; that by the said agreement between her and the defendant the plaintiff was to provide and furnish board at said section-house for such section hands and other employés of the defendant as it should desire, at the rate of four and one-half dollars per week, to be paid by the persons so fur-

nished with such board, but the defendant was to aid and assist the plaintiff in collecting her pay for such board by stopping and retaining the same for her out of the wages of those so furnished with such board; that plaintiff thereupon, to wit, on the said 5th day of November, A. D. 1883, moved into said section-house with her family and entered upon the discharge of her duties as the keeper thereof, and remained there in the discharge of such duties until the occurrence of the snowslide, on the 10th of March, A. D. 1884; that the defendant did not at any time notify or apprise the plaintiff or either of her said children or cause her or either of them to be notified or apprised of the danger of a snow-slide or snow-slides or of the liability of a snow-slide or snow-slides at such place where said section-house then was or in that locality. And the plaintiff, further to maintain the issues on her part, introduced evidence tending to show that said section-house was a onestory frame building and was constructed in 1882, about the time that said railroad was first operated in that section of the country; was situated in the mountains, near the base of a high and steep mountain, and in a place subject to snow-slides and dangerous on that account; that the sides of the mountain at the base of which was the house in question were marked by the tracks of former snow-slides, but only those familiar with snow-slides and their effects would know what they meant; that the defendant was aware of said danger at and before the time it engaged the plaintiff to keep its said section-house; that the plaintiff and her said children had never before resided in a region of country subject to snowslides, and had no knowledge of snow-slides or of their indications or of the dangers incident thereto, and was not aware of the particular danger in question; that there was a prominence or hip on this mountain side, about ten or twelve hundred feet above the section-house, which cut off a view of the mountain side above said hip from the section-house or its immediate vicinity; that above said hip there was a large depression or draw on the mountain side extending from said hip to the summit, into which great quantities of snow fell and drifted during the winter season of each year, thus tend-

ing to create snow-slides of danger to persons in said section-house or its vicinity; that this danger was not apparent even to a person having knowledge of snow-slides and their causes without a view or examination of this mountain side above said hip; that the altitude of said section-house was about 10,200 feet, and of the summit of said mountain nearly 12,000 feet; that the snow-fall there was great in the winter season of each year, and that depressions on the mountain side were filled with snow by drifting; that the snow-slide of March 10th, 1884, which killed the said children, proceeded from this depression above said hip; that a snow-slide of less dimensions and of less scope and extent occurred there in February, 1883, in the same place and from the same source, which reached to within about two hundred feet of said section-house and of which the defendant had knowledge at the time thereof.

"That the attention of the superintendent of the construction of said railroad and of said section-house was called to the fact of such danger, at or about the time said section-house was built, by one of the civil engineers of said defendant who assisted in locating the line of said railroad.

"That her said son, Andrew Doyle, was an employé of the defendant — a section hand on the same section where said section-house was located — at the time he was so killed by said snow-slide; that the plaintiff and her said children were in said section-house at the time the said children were killed, and that none of said children were aware of said danger before the said snow-slide of March 10th, 1884, occurred.

"That through this prominence or hip on the mountain side there was a chasm or draw from twenty to thirty feet wide, which continued on down to the section-house, but became wider after leaving the hip; that with this draw another draw united about midway between the section-house and the said hip and formed one draw from their point of union to the section-house.

"That this mountain is a part of the range of mountains known as the Continental Divide, which divides the waters of the Atlantic from those of the Pacific. At this point above Woodstock station the course of the mountain is nearly east

and west. This railroad passes this mountain by means of a tunnel called 'Alpine tunnel,' which is to the westward of a line north of Woodstock and descends this mountain at a heavy grade, along the side thereof about midway between the section house and the said hip on the mountain, (which hip is termed a projection of rocks by some of the witnesses,) and passes on to the eastward of Woodstock a considerable distance, where it turns, and, forming a kind of horseshoe shape, runs back again past Woodstock, but between the section-house and said hip — the section-house being below and distant from this lower track about two hundred and thirty feet — and the two tracks forming this horseshoe are both between the section-house and said hip and on a direct line from the section-house up to the hip. The two tracks are about five hundred feet apart, the upper track being about seventy feet higher in point of altitude where they cross this line from the section-house to the hip on the mountain side above; that there was a water-tank on the upper side of the lower track fifty or sixty feet to the westward of the section-house, which water-tank was injured by the snow-slide of February, 1883.

"That the snow-slide of March 10th, 1884, spread out as it descended the mountain, so that where it passed over the lower railroad track its space in width was six or seven hundred feet, and the section-house was not far from the centre of said snow-slide track.

"That the contour of this mountain, beginning at the section-house and ascending the mountain, is about as follows, to wit: Above the section-house it slopes slowly to the first railroad track; then there is a rock-slide; then there is a bench above that and on the same level of the upper railroad track, and above that a steep gorge, and on each side of said gorge there is a thin belt of timber, and between these belts of timber and along the gorge there is a space from three to four hundred feet in width of nothing but rock, with a very steep slope, and above this slope some very steep rocks, (the hip on the mountain side,) and above this hip is a large basin or depression extending on up the mountain side three or four thousand feet long to the summit of the mountain, which has an elevation or

altitude of about 11,500 feet, the mountain side above the hip being very steep, having a slope of more than thirty-three degrees, and from the hip down there is quite a precipitous piece of rock, not perpendicular, but quite steep, and after or below that the slope is at an angle of about twenty-five degrees. In the basin above the hip there is no timber and in and about the section-house there is a space of eight or nine hundred feet square of [on?] which there is no timber except three or four trees.

"That the timber on the mountain side was sparse and scattered; that only a few trees were carried down by the snow-slide; that snow-slides do not always follow beaten tracks made by former snow-slides on the same mountain side, but frequently depart therefrom; that the snow-slide of March 10th, 1884, separated into broken fragments or divisions before reaching the base of the mountain, one of which struck the section-house, resulting in the injuries complained of.

"That the winter of 1883–4 was severer and the snow fell some deeper than the winter previous thereto, and that it snowed heavily and continuously from about the first of March to the 10th of March, 1884, and the trains had ceased to run on account of the snow; that ordinarily in the winter season the snow was from five to seven feet deep in said locality in places where it did not drift and after it had settled compactly; that it drifted greatly, filling up basins and depressions on the mountain sides; that there were rock-slides and existing evidences of former snow-slides on this mountain side above said section-house.

"That the snow-slide of February, 1883, deposited snow and debris on the upper track of the railroad above said section-house from twenty to twenty-five feet deep; and for a considerable space of time from then, during the remainder of that winter and the following spring, the said railroad was not operated on account of the snow.

"And the defendant, to maintain the issues on its part, introduced evidence tending to prove that said section-house was built below the said tracks and behind, and protected by a

thick growth of timber above and between said section-house and the mountain; that there were no marks or tracks of former snow-slides directly above or in the vicinity of said section-house; that the defendant was not aware of any danger from snow-slides at the place where the section-house was built, but, on the contrary, that the officers of the company had carefully examined the locality where the same was built and the contour of the mountains above the same to the summit of the range, and that said section-house was built at that place because the officers of the company thought that it was —[a?] safe place and could not be endangered by snow-slides, which were apt to occur in that part of the country; that the prominence or hip spoken of was a protection against snow-slides which might occur on the mountain sides above said section-house; that an examination of the ground, timber, and rocks in the vicinity of where the house was built and above, on the mountain side, showed that there had not been a snow-slide there for at least two hundred years; that the snow-slide of March 10th, 1884, was caused by a storm of unprecedented severity and duration, and that the same came down through the timber above said house, breaking down and carrying with it standing trees, from bushes up to trees two feet in diameter; that the snow-slide mentioned as occurring in February, 1883, came down a considerable distance to the north of where the one came down in 1884, and that the snow-slide in 1883 did no damage except to cover up a short distance of the railroad track and break in some boards of the house under the water-tank; that the attention of the superintendent of construction of said railroad was not called by any one to the fact of there being any danger from snow-slides at the place where said section-house was built, but that the conversation or notice referred to was in regard to a place a mile or more farther up Quartz Creek; that the said Andrew Doyle had been an employé of the defendant as a section hand, but had quit work some days before on account of the road being blockaded by snow and all attempts to open it having been abandoned, and for ten days or more before the snow-slide no work whatever was being done by defendant on said road for

a distance of several miles each way from said Woodstock; that said prominence or hip on the mountain side mentioned by the witnesses tended to protect said section-house and its immediate locality from snow-slides; that there was no chasm or draw immediately above said section-house, and that whatever formation of that kind there was on said mountain was a distance of two hundred feet or more north of said section-house; that said section-house was broken down by said snow-slide of March 10th, 1884, by a spreading out of the snow as it came down the mountain, and that said section-house was on the southerly side of said snow-slide; that the gorge referred to is simply an opening a few feet wide in the ridge of rock referred to as the hip or prominence; that a short distance above said prominence the general timber line of the country is reached, above which no timber occurs; that there was a considerable amount of timber between said section-house and the first railroad track and a thick growth of large timber immediately above the first railroad track, extending up some distance towards the second track of the loop, and some scattering timber above the upper track; that there are no rock-slides or existing evidences of former snow-slides on the mountain sides immediately above said section-house.

"And the foregoing was all the evidence in the case."

To the answers of the court to the prayers for instructions, and to the charge the plaintiff has filed thirteen assignments of error.

The twelfth assignment alleges that "the Circuit Court erred in charging the jury substantially to the effect that they must find for the defendant." And in the brief of the plaintiff in error it is asserted that the answers of the court to the several requests for instructions were in effect directions to the jury to find for the defendant.

Although, in point of fact, the court did not give the jury peremptory instructions to find for the defendant, but left the cases to them on instructions under which they might have found verdicts for the plaintiff, yet the validity of the plaintiff's exceptions to the court's treatment of the cases may be conveniently tested by assuming, for the present, that the

charge and instructions legally amounted to a direction to find for the defendant. If an examination of the facts and of the principles of law involved warrants us in concluding that the court would have been justified in so doing, it will not be necessary to consider each and every assignment of error nor to minutely scan isolated expressions used by the court.

The first question to be determined is what was the relation between the plaintiff and the railway company. Was Mrs. Doyle a servant or employé of the company, aiding in the transaction of its business and subject to its directions; or was she a tenant at will, holding the premises by an occupation during the will of the company? The facts averred by the plaintiff show that the company was not interested, in a legal sense, in the management of the boarding-house, did not receive the board money, pay the expenses, take the profits, or suffer the losses. The company could not call upon her for any account, nor could she demand payment from the company for any services rendered by her in carrying on the boarding-house. The fact that the company agreed to aid her in collecting what might be due to her from time to time by the boarders, by withholding moneys out of the wages payable to them by the railroad company, did not convert Mrs. Doyle into a servant of the company or change her relation to the company as a tenant at will of the company's house. Such an arrangement might equally have been made if Mrs. Doyle had been the owner of the house. The court below was not in error in holding that the relation of the parties was that of landlord and tenant.

If, then, such was the relation of the parties, upon what principle can a liability for the damages occasioned by the snow-slide be put upon the company? There was neither allegation nor proof of fraud, misrepresentation or deceit, on the part of the defendant company, as to the condition of the premises. Indeed, it was not even pretended that the catastrophe was in any way occasioned by the condition of the house.

It was, indeed, alleged that the section-house was built near the base of a high and steep mountain, and in a place subject

to snow-slides, and dangerous on that account; that the company was aware of said danger; that the plaintiff and her children had never before resided in a region of country subject to snow-slides, and had no knowledge of snow-slides, or of their indications, or of the dangers incident thereto; and that the company did not at any time notify or apprise the plaintiff or her children of the danger of snow-slides or of the liability of snow-slides at such place where said section then was or in that locality. And upon this alleged state of facts it was contended that the jury had a right to find that the railway company was guilty of carelessness or disregard of duty towards the plaintiff such as to make it liable in these actions.

It is, however, well settled that the law does not imply any warranty on the part of the landlord that the house is reasonably fit for occupation; much less does it imply a warranty that no accident should befall the tenant from external forces, such as storms, tornadoes, earthquakes or snow-slides. The law is thus stated in a well-known work on Landlord and Tenant:

"There is no implied warranty on the letting of a house, that it is safe, well built or reasonably fit for habitation; or of land, that it is suitable for cultivation, or for any other purpose for which it was let. And where a person hired a house and garden for a term of years, to be used for a dwelling-house, but subsequently abandoned it as unfit for habitation, in consequence of its being infested with vermin and other nuisances, which he was not aware of when he took the lease, the principle was laid down, after an elaborate review of all the cases where a contrary doctrine seemed to have prevailed, that there is no implied contract on a demise of real estate that it shall be fit for the purposes for which it was let. Consequently an abandonment of the premises under these circumstances forms no defence to an action for rent. And, in all cases where a tenant has been allowed, upon suggestions of this kind, to withdraw from the tenancy, and refuse the payment of rent, there will be found to have been a fraudulent misrepresentation or concealment as to the state of the prem-

·ises which were the subject of the letting ; or else the premises proved to be uninhabitable by some wrongful act or default of the landlord himself.   The lessor is not, however, always bound to disclose the state of the premises to the intended lessee, unless he knows that the house is really unfit- for habitation, and that the lessee does not know it, and is influenced by his belief of the soundness of the house in agreeing to take it ; for the conduct of the lessor may, in this respect, amount to a deceit practised upon the lessee." Taylor, Landlord and Tenant, § 382.

The principles applicable to the present case have been well stated in the recent case of *Bowe* v. *Hunking*, 135 Mass. 380. The syllabus states the case and decision as follows:

"A tenant cannot maintain an action against his landlord for an injury caused by falling upon a stair in the tenement, the tread of which has been sawed out and left unsupported by a previous tenant, there having been full opportunity to examine the stair at the time of hiring, and no warranty of the fitness of the tenement having been given by the landlord ; the only evidence of knowledge on the part of the landlord being that he knew the stair had been sawed out, that he tried it, and it bore his weight, and he thought it would bear anybody's weight."

The judge directed a verdict for defendants, and the Supreme Court sustained this ruling.   Field, J., giving the opinion of the court, said (p. 383): "There is no warranty implied in the letting of an unfurnished house or tenement that it is reasonably fit for use (citing cases).   The tenant takes an estate in the premises hired, and persons who occupy by his permission, or as members of his family, cannot be considered as occupying by the invitation of the landlord, so as to create a greater liability on the part of the landlord to them than to the tenant. The tenant is in possession, and he determines who shall occupy or enter his premises (citing cases).

"In the case at bar there was no express or implied warranty, and no actual fraud or misrepresentation. If the action can be maintained it must be on the ground that it was the duty of the defendants to inform the tenant of the defect in the

staircase; this duty, if it exists, does not arise from the contract between the parties, but from the relation between them, and is imposed by law. If such a duty is imposed by law, it would seem that there is no distinction, as a ground of liability, between an intentional and an unintentional neglect to perform it; but in such a case as this is there can be no such duty without knowledge of the defect. There is no evidence of any such knowledge, except on the part of C. D. Hunking, and the other defendants cannot in any event be held liable, unless his knowledge can be imputed to them, as the knowledge of their agent in letting the premises. The evidence is insufficient to warrant the jury in finding that C. D. Hunking intentionally concealed the defect from the tenant; and the action, if it can be maintained, must proceed upon the ground of neglect to perform a duty which the law imposed upon the defendants.

"A tenant is a purchaser of an estate in the land or building hired; and *Keates* v. *Cadogan,* 10 C. B. 591, states the general rule that no action lies by a tenant against a landlord on account of the condition of the premises hired, in the absence of an express warranty or of active deceit. See also *Robbins* v. *Jones,* 15 C. B. (N. S.) 240. This is the general rule of *caveat emptor.* In the absence of any warranty, express or implied, the buyer takes the risk of quality upon himself. *Hight* v. *Bacon,* 126 Mass. 10; *Ward* v. *Hobbs,* 3 Q. B. D. 150; *Howard* v. *Emerson,* 110 Mass. 320. This rule does not apply to cases of fraud."

This rule of *caveat emptor* has been applied also in many other cases, some of which we now refer to.

*Keates* v. *Cadogan,* above cited, was an action on the case. The declaration stated in substance that the defendant knew that the house was in such a ruinous and dangerous state as to be dangerous to enter, occupy or dwell in, and was likely to fall and thereby do damage to persons and property therein; that the plaintiff was without any knowledge, notice or information whatever that the said house was in said state or condition; that the defendant let the house to plaintiff without giving plaintiff any notice of the condition of the house; and

that plaintiff entered, and his wife and goods and business were injured. Defendant demurred to the declaration and the court unanimously sustained the demurrer. Jervis, C. J., giving the opinion said: " It is not pretended that there was any warranty, express or implied, that the house was fit for immediate occupation; but it is said, that, because the defendant knew that the plaintiff wanted it for immediate occupation, and knew that it was in an unfit and dangerous state, and did not disclose that fact to the plaintiff, an action of deceit will lie. The declaration does not allege that the defendant made any misrepresentation, or that he had reason to suppose that the plaintiff would not do what any man in his senses would do, viz., make proper investigation, and satisfy himself as to the condition of the house before he entered upon the occupation of it. There is nothing amounting to deceit: it was a mere ordinary transaction of letting and hiring." pp. 600, 601.

The rule of *caveat emptor* was also applied in the recent case of *Woods* v. *Naumkeag Steam Cotton Co.*, 134 Mass. 357. Defendant was owner of a tenement house, fitted for four families, and plaintiff was tenant at will, or wife of tenant at will. There were three stone steps, leading down from the yard to the street, on which ice and snow had accumulated, and on which plaintiff slipped and received the injury complained of. There was evidence tending to prove that at the time plaintiff was injured she was in the exercise of due care. The jury viewed the premises. Plaintiff contended that the steps were of such material and constructed in such manner that they occasioned the accumulation of snow and ice thereon improperly; and that the defendant's omission to place a rail on either side, or to take other reasonable measures to prevent one from falling, was such negligence as would render the defendant liable. But the trial court held there was no evidence to go to the jury, and directed a verdict for defendant; and the Supreme Court sustained this ruling. Field, J., giving the opinion, says (p. 359):

" There may be cases in which the landlord is liable to the tenant for injuries received from secret defects, which are

known to the landlord and are concealed from the tenant, but this case discloses no such defects in the steps . . . p. 361. The ice and snow were the proximate cause of the injury.

" The exceptions state that no railing had ever been placed on either side of the steps, that the jury viewed the premises, and that it was contended 'that the steps were of such material and constructed in such manner that they occasioned the accumulation of ice and snow thereon improperly.' The steps were of rough-split, unhewn granite, and the 'structure of the steps remained unchanged from the time of the plaintiff's first occupancy of the tenement to the time she received her injury.' The defendant was under no obligation to change the original construction of the steps for the benefit of the tenant."

*Hazlett* v. *Powell*, 30 Penn. St. 293, was an action of replevin, in which an apportionment of rent was claimed by the tenant of a hotel, on the ground that he had been partially evicted by the act of an adjoining owner in building so that the tenant's light and air from one side of his hotel were shut off or obstructed, and, as a result, that the hotel was rendered *pro tanto* unfit for the purpose for which it was intended to be used. There was an offer to prove certain facts, (p. 294,) which the court states as follows (p. 297):

"But the rejected proposition also contained an offer to prove that the lessor knew at the time of executing the lease that the adjoining owner intended building on his lot — at what time is not offered to be shown — and did not communicate this information to the lessees. We think he was not bound to do so; and that, if the evidence had been received, it would have furnished no evidence of fraud on [the] part of the lessor, or become the foundation in equity for relief of the lessee. The substance of the complaint regarded something that the lessor was no more presumed to know than the lessees; it was nothing which concerned the title of the lessor or the title he was about to pass to the lessees. It was a collateral fact — something only within the knowledge and determination of a stranger to both parties, and, if material to either, I can see no obligation resting on either side to furnish

to the other the information. It was not alleged that the lessor made any representations on the subject, or that there was any concealment of the information; or that any relation of trust and confidence existed between the parties; or that the lessees were misled by his silence, and entered into the contract under the belief that the vacant lot would not be occupied; or that they were in a position in which they could not by diligence have ascertained the fact for themselves, and that they were not legally bound to take notice of the probability that the ground would be occupied by buildings, and inquire for themselves. These were elements to be shown to constitute fraud, and make the testimony available.

" 'The general rule, both in law and equity,' says Story on Contracts, § 516, 'in respect to concealment is, that mere silence in regard to a material fact, which there is no legal obligation to disclose, will not avoid a contract, although it operates as an injury to the party from whom it is concealed.' But the relation generally which raises the legal obligation to disclose facts known by one party to the other, is where there is some especial trust and confidence reposed, such as where the contracting party is at a distance from the object of negotiation, when he necessarily relies on full disclosure; or where, being present, the buyer put the seller on good faith by agreeing to deal only on his representations. In all these and kindred cases, there must be no false representations, nor purposed concealments; all must be truly stated and fully disclosed. 'The vendor and vendee,' says Atkinson on Marketable Titles, 134, ' in the absence of special circumstances, are to be considered as acting at arm's length.' 'When the means of information as to the facts and circumstances affecting the value of the subject of sale are equally accessible to both parties, and neither of them does anything to impose on the other, the disclosure of any superior knowledge which one party may have over the other is not requisite to the validity of the contract.' (Id.) Illustrative of this is the celebrated case of *Laidlaw* v. *Organ*, 2 Wheat. 178. The parties had been negotiating for the purchase of a quantity of tobacco; the buyer got private information of the conclusion of peace with Great Britain, and called very early

in the morning following the receipt of it on the holders of the tobacco, and, ascertaining that they had received no intelligence of peace, purchased it at a great profit. The contract was contested for fraud and concealment. Chief Justice Marshall delivered the opinion of the court, to the effect that the buyer was not bound to communicate intelligence of extrinsic circumstances, which might influence the price, though it were exclusively in his possession. And Chief Justice Gibson, in *Kinzing* v. *McElrath*, 5 Penn. St., (5 Barr,) 467, in commenting on this decision, says: 'It would be difficult to circumscribe the contrary doctrine within proper limits, where the means of intelligence are equally accessible to both parties.' See also *Hersey* v. *Keembortz*, 6 Penn. St., (6 Barr,) 129. When the information is derived from strangers to the parties negotiating, and not affecting the quality or title of the thing negotiated for, it is not such as the opposite party can call for. We see no error in the rejection of the evidence on account of this part of the proposition, as there was no moral or legal obligation for the lessor to disclose any information he had on the subject of the intended improvement of the adjoining lot. It was not in the line of his title. It was derived from a stranger; it might be true or false; and the lessees could have got it by inquiry, as well as the lessor.

"It is well settled that there is no implied warranty that the premises are fit for the purposes for which they are rented, (citing authorities,) nor that they shall continue so, if there be no default on the part of the landlord."

In the recent case of *Viterbo* v. *Friedlander*, 120 U. S. 707, 712, Mr. Justice Gray, who delivered the opinion of the court, said, in contrasting the doctrines of the common and civil law: "By that law" [the common law, unlike the civil law] "the lessor is under no implied covenant to repair, or even that the premises shall be fit for the purpose for which they are leased."

The plaintiff's evidence failed wholly to show that there was any special and secret danger from snow-slides, which was known only to the railway company, and which could not have been ascertained by the plaintiff. It was, indeed, alleged

that "the section-house was in a place of danger from snow-slides;" but this was plainly the danger that impended over any house placed, as this one necessarily was, on a mountain side in a country subject to heavy falls of snow. The danger referred to was that incident to the region and the climate, and, in the eye of the law, as well known to the plaintiff as to the defendant.

On a careful reading of the plaintiff's evidence we are unable to see that the jury could have been permitted to find any positive act of negligence on the part of the railroad company, or any omission by it to disclose to the plaintiff any fact which it was the company's duty to disclose.

If, then, the plaintiff's case, as it appeared in her evidence, would not have justified a verdict on the ground of negligence or a fraudulent suppression of facts, and as the determination of the nature of the relation between the parties, as that of landlord and tenant, was clearly the function of the court, there would, in our opinion, have been no error if the court had really given a peremptory instruction to the jury to find for the defendant.

However, the record discloses that the court permitted the cases to go to the jury. It is true that the remarks made by the judge must have indicated to the jury that his own view was against the plaintiff's right to recover. But it has often been held by this court that it is not a reversible error in the judge to express his own opinion of the facts, if the rules of law are correctly laid down, and if the jury are given to understand that they are not bound by such opinion. *Baltimore & Potomac Railroad* v. *Fifth Baptist Church*, 137 U. S. 568; *Simmons* v. *United States*, 142 U. S. 148.

It is not necessary for us to review in detail the criticisms made in the several instructions, for, as we have seen, even if such instructions had amounted, in a legal effect, to a direction to find for the defendant, no error would have been committed.

It is obvious that these views of the case of Marcella Doyle, claiming for her personal injuries, are equally applicable to her suit, under the statute, for the loss of her children. The

latter must be regarded as having entered under their mother's title, and not by reason of any invitation, express or implied, from the railway company, and hence they assumed a like risk, and are entitled to no other legal measure of redress.

No error being disclosed by these records, the judgment of the court below is, in each case,

*Affirmed.*