### LEMBECK & BETZ EAGLE BREWING CO. v. McANARNEY.

### McANARNEY v. LEMBECK & BETZ EAGLE BREWING CO.

(District Court, W. D. New York. January 4, 1923.)

No. 300 B.

**Corporations ⊛316(1)—Director, buying property from corporation, must fully disclose facts within his knowledge.**

A director of a corporation, who purchased from it property situated in another state, of which he had been manager, but of which the other directors had little knowledge, by reason of his relationship to the corporation was bound, not only not to misrepresent the property, but to fully disclose his knowledge of its condition and value, and his failure to do so *held* to entitle the corporation to cancellation of the contract, where the purchase price was clearly inadequate.

In Equity. Suit by the Lembeck & Betz Eagle Brewing Company against Thomas W. McAnarney, with cross-suit. Decree for complainant, and cross-suit dismissed.

Mandeville, Personius & Newman, of Elmira, N. Y. (Thomas G. Haight, of Jersey City, N. J., of counsel), for plaintiff.

James M. E. O'Grady, of Rochester, N. Y., for defendant.

HAZEL, District Judge. In these actions the Lembeck & Betz Eagle Brewing Company (for brevity the Brewing Company) asks to

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

have a contract of sale to Thomas W. McAnarney, dated August 26, 1919, vacated on the ground of inducement to enter into it by fraudulent representations made by defendant, McAnarney, and also on the ground that Mr. McAnarney (to whom I shall hereinafter refer as defendant) was a director of the Brewing Company, and the contract of sale was therefore either void or voidable. In the second action the plaintiff, McAnarney, asks to have the same contract specifically performed. Both actions were tried together, and a single opinion will suffice.

The Brewing Company was a New Jersey corporation, and had, before the enactment of the national prohibition statute, conducted a brewery at Jersey City and a barley malt house at Watkins, N. Y., and from the time of prohibition of beer, etc., for beverage purposes became imminent, it desired to dispose of the malt house and plant for the best price obtainable. The defendant lived at Watkins, and had been an employee of the Brewing Company on an annual salary for nearly 30 years. Since 1905 he had entire charge, as manager, of the malt house and the malting business, was the authorized New York state representative of the corporation, and one of its directors for upwards of 20 years, though he only owned 10 shares of the capital stock, of the par value of $100 each. The evidence conclusively establishes that throughout he was trusted implicitly by his codirectors and officers of the Brewing Company. His expressed opinion and declarations as to the value and condition of the malt house property, and the malting business generally, was believed and relied upon. As manager he was practically the custodian of the funds realized from the malting business, being authorized to draw on banks by checks and make required disbursements. No other director lived at Watkins, and it appears that only the president, Otto A. Lembeck, former president, Gustave W. Lembeck, and a director named McAleenan, had each once on separate occasions, several years before making the contract in question, visited the malting plant, and examined the buildings and plant in a cursory way only, without any thought of determining its marketable value.

No malting was done after the spring of 1918. Indeed, the malt house was practically closed, though malt was shipped during the summer and autumn, and some annual repairs were made on the main building. The desire of the directors to sell the property is evidenced by their resolution adopted at their September, 1918, meeting. They offered the entire property for sale, and the executive committee was empowered to fix the price. The subject was discussed at subsequent meetings, upon receiving a report from defendant that he could not obtain a purchaser at $15,000; that it was out of the question, and no one would consider it; that the property was not worth anything near that amount. In July, 1919, the directors decided to put a board sign "For Sale" on the property at the price of $12,000, and requested defendant to post the sign. He complied, but did not state on the sign the sales price. About this time he wrote to the president, offering to buy the plant for $7,000, but the directors to whom the matter was submitted thought the price too low. On August 26, 1919, he

attended a directors' meeting and displayed a photograph of the malt house floor, or a part of it, that had collapsed, and also showed a soft or spongy piece of beam in illustration of the dilapidated condition of the malt house and buildings, and said in effect that extensive repairing would be necessary before the property could be used for any purpose or sold; that the building was in danger of immediate collapse; that it would require the expenditure of a large sum of money immediately, if collapse was to be averted; and that he was afraid the building was going down. The directors were unwilling to incur any further expense for repairs or upkeep of the buildings, and upon defendant then offering to give $8,000 for the land, building, and contents, they accepted his offer on condition that he make an advance payment of $2,650, and pay $500 annually thereafter until full payment of the purchase price. The terms being accepted, the contract embodying the arrangement and terms of sale was formally entered into. Subsequently, on April 27, 1920, the buildings and contents were totally destroyed by fire.

The insurance on the plant annually, prior to the contract of sale, usually amounted to $25,000, but early in 1918 there was transferred thereto additional insurance amounting to $15,000, which had previously been carried on grain and malt, so that the insurance on the buildings amounted to $40,000; the Brewing Company claiming that the increase was made because of defendant's statements that there would be cancellations of other policies. Insurance in fact to the amount of $15,000 was canceled, thus reducing the total insurance to $25,000. After acquiring the property the defendant again increased the amount to $42,750, though his agreement with the Brewing Company was that when the existing policies expired he would keep the buildings insured at not less than $10,000. He not only continued the existing policies of insurance, but obtained renewals and new insurance on the plant and personalty amounting to over $51,250. Upon hearing that the policies had not been reduced, and that additional insurance had been taken out on bags and grain sprouts and other articles in the building at the time of making the contract, and of which no mention was made in the negotiations, the president of the Brewing Company, suspecting that an unfair advantage had been taken of the directors, refused to perform, and, after making an investigation as to the value of the premises in question, the directors canceled and rescinded the undertaking. Their action in this respect was subsequently ratified and confirmed by the stockholders at a special meeting.

A tender back to defendant has been made of all the money paid by him to apply on the transaction, but he has refused acceptance and demands performance. It also appeared that shortly before the sales contract was executed the village of Watkins assessed the land and buildings at $30,000; but the directors, deeming the assessment excessive, began legal proceedings in the Supreme Court of the state to lower it to $15,000—a proceeding that was pending at the time of the sale. Immediately after acquiring the property the defendant had it appraised by the American Appraisal Company for the pur-

287 F.—59

pose of proving its value in the litigation, and the completed appraisal showed a sound valuation (not cost of reproduction) of $48,461.82. Neither the president of the Brewing Company, though he authorized the action to contest the assessment, nor any director, was informed of the result or appraised value until after the fire, or about six months thereafter.

The position of the Brewing Company is that the defendant, McAnarney, at various times before the contract was executed, made material, false, and fraudulent representations relating to the true condition and value of the property and the articles contained therein, with the intent of inducing the directors, who were ignorant of its real value, to sell the same to him at a low price, or at a less price than its actual value. It is necessary first to determine whether there was actual fraud to induce the sale, or whether the contract is voidable at the option of the cestui que trust, or the consideration was wholly inadequate, thus invalidating the sale, regardless of its consummation through fraud or deceit. Much testimony was given on both sides relating to the condition of the plant and interior dilapidation at the time the photographs of the collapsed roof (Exhibits 7, 8, and 9) were shown the directors, and defendant is claimed to have falsely represented that many parts of the beams and timbers of the building were as decayed as the piece of timber which he had brought with him for their inspection, and that the piling had sagged and was sinking; that the bricks were crumbling, the roof leaking, and that it would be necessary to expend from $4,000 to $5,000 to prevent the complete collapse of the building; and that the land was worth not more than $2,500, when in fact its fair value was in the neighborhood of $5,000.

The representations are claimed by defendant to have been substantially true, and there was testimony in support thereof, except as to the piling sinking, which defendant denies; yet, on the other hand, there is creditable evidence on the part of the plaintiff to support its claim that the condition of the malt house and its asserted dilapidation was overdrawn and exaggerated. It appears that repairs were made upon it annually. The buildings were kept painted, broken joists were repaired, and the roof-bearing truss reconstructed in 1913. There was bulging of the brick, and one or two cracks therein on the sides of the building; but that had been so for years without the discovery of any enlargement. The main buildings were erected about 65 or 70 years ago, and repairs at the time of sale no doubt were required on the floors, the walls, and the roof, and perhaps the bulging sides should have been straightened. But according to the testimony of Jaeger, who aided in the appraisal of the plant in the fall of 1919, shortly after the sale, the condition of the malt house was not bad. Indeed, he said the side walls were in good condition; the floors were not sinking; the bulging of the brick, or cracks, though present, were unimportant, and did not impair the strength of the building. He saw no leak in the roof, though it rained on two occasions while he was there, and he made an examination of the loft to discover leaks. The witness Horsack, who also assist-

ed in the appraisal, testified to a similar effect, and that the floors were intact and firm, except the fourth, which had collapsed. Barrows, who examined the property at the instance of the village of Watkins in relation to the assessment proceeding, testified that he found the floors level, no important cracks, or bulging of the walls, and all timbers in good condition.

It is contended that probative value should not be given to this testimony, and it is argued that the collapsed section of the roof plainly indicates the bad condition of the entire building. I am unable to accept this view. Plaintiff's testimony, by Jaeger, Horsack, and Barrows, in the main impressed me favorably, and no substantial reason exists for disbelieving them. Certainly, if the dilapidated condition of the malt house had been as represented and as testified by defendant's witnesses, it is scarcely to be supposed that the value would have been determined at the substantial amount heretofore stated. If the iron posts had sunk, and the girders and corbels supporting it were badly decayed, as defendant claims, it may be that the inference would not be unwarranted that the malt house throughout was in bad condition, requiring extensive repairing to make it staunch; but it is inconceivable, if such had been its condition, that the appraisal by disinterested and experienced appraisers would not have disclosed it. The expert witnesses, in accounting for the collapse of the girder on the fourth floor of the malt house, said that the iron posts, or columns supporting it, in their opinion, were forcibly pulled from their upright position.

I do not find, however, that their opinion in this relation is supported by the facts and circumstances. It is not at all improbable that the collapse was due to the enormous strain to which the girder and corbel and columns had been subjected for many years in the malting season from moist grain that was customarily stored on the fourth floor. Although there was no grain there when the floor collapsed, and none had been kept there since early in 1918, yet periodical weight and increased stress undoubtedly impaired the firmness of the end of the girder and the corbel, causing the former to break and in some unexplained way disengage from its support in the side walls. The Brewing Company attaches importance to the position on the floor of the iron columns, as shown in the exhibit photographs, and the failure to find the wall anchor on the end of the girder after the fire, and argues therefrom that external force was used to pull them down. This view, however, is too conjectural to justify me in a finding that the defendant, or any one in his interest, had committed such a wrongful act.

Although it became necessary to expend money to either repair or remodel the building to comply with the factory laws of the state, yet this point is not of controlling importance, since in my opinion the buildings were useful in the condition they were in at the time of the sale. The elaborate remodeling contended by defendant in order to make them salable was not absolutely required. These considerations lead to the conclusion that the representations by defendant re-

lating to the condition of the premises were exaggerated and overdrawn.

I find, also, that it was stated to the Brewing Company that only coal and machinery were contained in the building, nothing being said about malt sprouts and bags. By the proof of fire loss it appears that about 17 tons of malt sprouts, valued at $1,139, that were contained in the malt house at the time of the sale, were destroyed. It was also ascertained that at the time of sale there were 6,000 bags at the malt house, valued at $3,000 in 1919, while the coal was sold for $1,239, though defendant declared to the directors, as the evidence shows, that it had no sale value, because it could not be used for domestic purposes, on account of its large size. The aggregate value of these articles was within $3,000 of the entire purchase price of the land and buildings. The defendant denies misrepresenting the contents of the building or their value; but the proof is that on several occasions he spoke to the directors of the coal, without mentioning the malt sprouts or bags. Although ordinarily no duty devolves upon a buyer of personal property to make disclosure to the seller of any facts or information possessed by him regarding the value of the goods he contemplates purchasing, even if the seller is ignorant of the actual value, and would not sell if he were aware thereof, yet in the present case the relations between the parties were of such a nature that a positive duty rested upon the defendant to disclose the actual contents of the building and their value if they had any. His silence affords ground for closely scrutinizing his actions with respect to the entire transaction. His intentional withholding of information under the circumstances may amount to a fraud and be subject to reparation in equity.

It is no answer to assert that the president of the Brewing Company must have known that grain would be conveyed in bags, and that bags were a necessary equipment, or that there would be sprouts in places, or that, since coal and bags were insured, it must be presumed that the directors knew or had reason to know what was contained in the building, since the Brewing Company, with relation to the sale of the plant and things contained therein, dealt only on defendant's representations. Doyle v. Union P. R. Co., 147 U. S. 413, 13 Sup. Ct. 333, 37 L. Ed. 223; American Car & F. v. Merchants D. T. Co. (D. C.) 216 Fed. 905. It is important to ascertain the law in relation to such a situation. If the Brewing Company was misled by fraudulent representations of the defendant, who was a director, the contract unquestionably is subject to rescission. The evidence in its entirety satisfies me that the directors, though desirous of selling the malt house, even at a sacrifice, nevertheless relied upon the statements of the defendant to guide them in fixing the sales price. Under the circumstances the defendant was peculiarly bound, because of the trust relationship he bore to the Brewing Company, to act in the utmost good faith in all his dealings and declarations relating to the condition of the property. The contract, it is true, is not absolutely void, and the directors were legally competent to assent to the sale; but concededly such a contract or engagement with codirectors must have

been just between the buyer and seller of what was included in the sale. The defendant, McAnarney, could not be permitted to knowingly underestimate or depreciate its value, or misrepresent the conditions as to required repairs, or conceal property, or adroitly refrain from mentioning it.

It is unnecessary to discuss the many authorities cited in the briefs that bear upon the rights and liabilities of a director buying property from the corporation. There is in my opinion no essential variance between the law prevailing in the state of New Jersey, wherein the contract herein was made, and the state of New York, the situs of the property. The rule that applies is that the defendant, even though a director of the plaintiff corporation, had a right to contract with his codirectors for the purchase of the property in question and such a contract is not ipso facto void. Williston on Corporations, vol. 3, § 1533. But the transaction, when an action is brought to rescind, is subject to close scrutiny, and void for fraud, unjust dealing, or overreaching. I do not find that the defendant is guilty of actual fraud or fraudulent intent, but the elicited facts show, I think, that there was exaggeration on his part as to the condition of the property to induce the sale thereof to him, and moreover a disingenuousness regarding the contents of the malt house, viz. bags and grain sprouts, together with the failure to make fair disclosure of the value of the property. That the defendant only had a small interest in the corporation, or small influence with his codirectors, is not of material importance, if the directors believed his statements and declarations with respect to the property in question and relied thereon, as I hold they did. The purchase price was so small in comparison with the price fixed by the appraisers after the sale that it justifies the inference that there was an overreaching by the defendant, and unjust advantage sought and obtained, which the careless inaptitude of the other directors does not excuse. Upon this point the law is clearly and succinctly stated in Twin-Lick Oil Co. v. Marburg, 91 U. S. 587, 23 L. Ed. 328, as follows:

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."

In Wing v. Dillingham, 239 Fed. 54, 152 C. C. A. 104, the Circuit Court of Appeals said:

"It has never been held that a director can buy anything of value from the corporation he serves, unless the purchase is fairly made and to the advantage of the company. In all cases it is the uniform holding that the sale must be fairly and openly made and for a fair consideration, and then the sale is voidable at the election of the company. Wherever there had been a sale by the corporation to the director, in a suit to annul and avoid the same, if the plaintiff failed to recover, it was upon the grounds: First, the sale was fairly made; second, the thing sold brought its value; third, the sale was subsequently ratified by the stockholders; or, fourth, the party at interest delayed too long."

The purchase herein by defendant was to the detriment of the corporation and for an insufficient consideration. The corporation, by its stockholders, therefore, had the right of election either to ratify the sale or to rescind the action of its directors. It appears that the directors and stockholders elected to avoid the sale, and in this particular they exercised their right within a reasonable time after the discovery that the defendant had dealt unfairly in the negotiations. The action of the directors in again electing the defendant a director was not a ratification of the sale, since the stockholders were not then aware of the defendant's misconduct.

There were other questions of fact presented and argued at the bar, but it is not deemed necessary to further discuss them. The material matters, as I conceive them to exist, relating to the status of the parties and the asserted bad faith of the defendant, have been sufficiently treated herein, together with the law applicable thereto.

For the reasons herein stated, the contract of sale in controversy must be set aside and canceled, the money paid by defendant to apply thereon, together with the amount paid by him for insurance, repairs, and upkeep of the property, must be returned to him with interest, while the bill brought by the defendant against the plaintiff for specific performance may be dismissed, with costs.