## NORRIS *v.* McFADDEN.

1. LANDLORD AND TENANT — UNFITNESS OF PREMISES — FRAUD — CONCEALMENT—THEATER—DEFENSE

In an action for the rent of a building leased to the defendant for use as a theater, unfit for that purpose, and known by the landlord so to be, because of its inflammable condition and because of the action of the common council requiring certain changes, before allowing it to be used for theatrical purposes, it is not an answer to the claimed defense that the defendant might have seen the condition of the theater when, in fact, he did not know of the requirements of the common council as to the safety of the building leased.

2. EVIDENCE—HEARSAY—OFFICIAL RECORDS OF COMMON COUNCIL.

The records of such action of the common council, containing the reports of officials in the line of their duty in regulating the building in the interest of public safety, were improperly excluded as hearsay evidence, and were competent to prove the action of the municipal authorities.

3. LANDLORD AND TENANT—LEASE—CONSTRUCTION—CONTRACTS.

Under a clause in the lease providing that certain specified changes should be made by defendant in strict accordance with the law of the State and the local ordinances, the duty of placing the building in safe condition, as required by the action of the municipality, did not devolve upon the tenant, who thereby merely undertook to make the alterations intended, in accordance with law.

4. SAME—LEASE—EXCUSES FOR NONPERFORMANCE.

Placing firemen in the building in the interest of public safety was not a trespass which excused the plaintiff from placing his premises in suitable condition for the purposes intended by the lessee.

5. SAME—RECOUPMENT—DAMAGES.

Recoupment lies for the damages sustained by a tenant because of a landlord's default in placing the premises in suitable condition for use as a theater, notwithstanding a partial compliance with the municipal requirements, if the jury find the tenant surrendered the premises because of the default.

Error to Kent; Sessions, J., presiding. Submitted January 7, 1909. (Docket No. 36.) Decided December 31, 1909.

Assumpsit by Mark Norris, trustee, and another against Austin McFadden for rent. A judgment for plaintiffs on a verdict directed by the court is reviewed by defendant on writ of error. Reversed.

*McKnight & McAllister,* for appellant.

*Taggart, Denison & Wilson (Albert Crane,* of counsel), for appellee.

McALVAY, J. Plaintiff, as trustee representing the

owners of a building called the "Auditorium" in Grand
Rapids, on September 6, 1904, rented the same ( not in-
cluding the basement and part of one gallery) to defend-
ant by a lease in writing signed by the parties, for the
term of one year after October 1, 1904, with the privilege
of renewals from year to year for the further period of
four years from its termination, by giving notice of such
renewal on or before May 1st of each year.   Thirteen
dates were reserved by plaintiff under contracts made by
him before this leasing.   The property leased was to be
occupied by defendant " for a roller skating rink, theater,
and concert hall."   The annual rental, $4,800, was to be
paid in six equal installments at times and a place stated
in the lease.   The lease contained the ordinary agreement
by the lessee to repair, reasonable use and wear and dam-
age by the elements excepted.   Defendant went into pos-
session of the premises, and for a time conducted a skat-
ing rink.   In April, 1905, defendant gave notice of a re-
newal for another year, and entered into a written agree-
ment with plaintiff on August 23, 1905, relative to con-
templated changes, alterations, and scenery in said Audi-
torium according to plans and specifications to be ap-
proved by plaintiff.   These changes consisted in certain
scenery, dressing rooms, and a fly gallery, and were to
comply with the statutes of Michigan and the ordinances
of Grand Rapids.   Twelve hundred dollars of the expense
of these changes and scenery was to be allowed defendant
out of rent, but to be repaid in case the lease was not re-
newed for the year 1906–1907.   Defendant expended
$2,700, including this $1,200.   The Auditorium had been
used for concerts and political meetings before defendant
rented it, but was not fitted up for theatrical perform-
ances.

The first performance was on November 27, 1905.
Plaintiff was required to promise the city building in-
spector certain changes before a performance was per-
mitted.   Firemen were placed by the fire marshal on the
premises in the presence of the people, on account of

which no performance was had, and the money was refunded to those who attended. No performance was allowed, except on special occasions, because the building was not fixed as ordered, and men in uniform on each occasion were stationed through the audience. But five performances were given. Agents would not book performances on account of the condition of the house. Defendant went out of the place in June, 1906. His claim is that he had no knowledge that the authorities had required certain things to be done by the plaintiff, for the public safety, until after he had renewed his lease and made the changes contemplated by the second agreement, and that plaintiff, having knowledge of these facts, and having agreed to comply with the demands of the authorities, leased defendant a building unsuitable for the purposes required.

In January, 1904, shortly after the Iroquois theater disaster in Chicago, a committee, which had been appointed by the common council of Grand Rapids, consisting of the ordinance committee, the board of police and fire commissioners, fire marshal and building inspector, "to examine the several opera houses, theaters and places of amusement in the city, to ascertain if such places are so constructed and operated as to comply with the requirements of the city ordinances, and what, if any, changes should be made to render them entirely safe to the public," reported to the council, together with a recommendation for its adoption, and that a certified copy of the report be delivered to the owners of the properties affected, and that each of them be required within 60 days after such notice to make the changes recommended. As to the Auditorium, the changes required were "to put in a wide stairway at the northeast corner of the building from the sidewalk to the balcony and main floor, and stairs leading from the same to the ground; that call boxes be placed in the building and at least two lines of hose be placed on the main floor, two in the balcony and two on the stage, to cover all exposed woodwork in the basement with ex-

panded metal lathing and two coats of hard plaster; also
a cement floor and automatic spinkler system in the en-
tire basement. We recommend that there should be
watchmen that would be acceptable to the fire marshal
employed to patrol the basement during each and every
occasion that the hall shall be used, until above mentioned
requirements are completed." The report was adopted,
and plaintiff duly received a certified copy. The base-
ment under the stage was occupied by tenants of plaintiff,
where furniture was packed, and a furniture repair shop
was conducted. Plaintiff had conferences with the city
authorities after this, and put in a new exit in front in
place of the iron stairway, and put in a double floor lined
with asbestos, replastered the basement with metal lath,
also put in iron columns in place of wooden ones. The
automatic sprinkler was not put in, nor the lines of hose
on the stage and balcony. This was the condition when
he rented to defendant.

Afterwards, in February, 1906, the council again con-
sidered this matter, and a special committee made report
as to what defendant had done and omitted to do, relative
to the changes required by action taken in January, 1904.
This report shows the condition in the basement under the
Auditorium as to liability of fire from the inflammable
nature of the material crowded into it, and the use of a
gas stove within a few inches of an unprotected wooden
partition. This committee recommended other and fur-
ther changes to be made by plaintiff, and expressed the
opinion that the condition at this place was hazardous;
that the proprietors be required to make the changes re-
quired in 30 days and that a patrol of five experienced fire-
men, by arrangement with them, be detailed to be present
during all times when audiences were convened, and in
default of compliance the Auditorium be closed forthwith.
Plaintiff was present and addressed the council upon the
matter. After some modification as to cement floor, and
the time for building a wall, the report was adopted. The
matter, as far as the evidence or proof offered shows, re-

mained in *statu quo* until June 11, 1906, when plaintiff sent a letter to the council, wherein he states that he is advised that the matter of the changes ordered in this building will come up for discussion, and proceeds to give his reasons why he has delayed in the matter, stating that the contracts have been let, but it had been impossible for contractors to get materials, etc., and closes by saying:

" The delay in complying with the requirement of the council has not been caused by any desire on the part of the owners to delay or fail to observe reasonable requirements, but simply on account of weather conditions and inability to get the material required for the work."

Under these conditions, the changes required by the council not having been completed, the defendant, who had gone on making the changes referred to in the agreement of August 23, 1905, relying, as he testifies, upon the promises of plaintiff made to him to complete the required changes ordered by the city authorities, went out of the building and turned the keys over to plaintiff June 19, 1906.

Upon the trial defendant offered in evidence the records of the common council of Grand Rapids to show the official action herein briefly outlined. These were objected to as hearsay and excluded. Plaintiff and defendant were the only witnesses in the case. At the close of the case plaintiff moved for an instructed verdict, which was granted by the court on the grounds:

(1) That there was no liability of the landlord for failing to show defects open to observation or reasonable investigation.

(2) That the records of the common council were not substantive proof of the facts contained in the reports, but was hearsay.

(3) That defendant was as responsible as the landlord for failure to comply with the municipal requirements by reason of the contract of August 23, 1905.

(4) That the firemen placed in the building were trespassers.

A verdict was directed for the full amount of $3,348.47.

Errors are assigned upon this action of the court. The case is here upon a writ of error sued out by defendant to review this action of the court. He claims that none of the reasons of the court were sound, as a matter of law.

1. Defendant had no knowledge of the action of the authorities in ordering the plaintiff to comply with orders to make the building safe for the public, and plaintiff withheld such knowledge from defendant. No examination of the premises leased by defendant would have disclosed the requirements of the common council relative to the safety of the building.

2. The records offered in evidence were the official records of the council kept as required by law. The matter was within the province and authority of the council to consider and act upon, and the record contained the action taken by the council. The reports embodied in this record were the reports of city officials made in the line of duty and reported to the legislative body. We think the record presented was admissible as evidence under the statute of the official action of the council in regard to the regulation of the building in the interests of the public safety. Jones on Evidence, § 520; 1 Greenleaf on Evidence, § 483; *Thurstin* v. *Luce*, 61 Mich. 292 (28 N. W. 103); *People* v. *Kemp*, 76 Mich. 410 (43 N. W. 439); 3 Comp. Laws, § 10193. It was error to exclude these records.

3. The court held that, on account of the agreement of August 23, 1905, defendant was equally responsible with his landlord for failure to comply with the requirements of the council. This agreement had no reference to the things ordered done by the council. It was entered into nearly two years after the first action of the council, and the clause relied upon by plaintiff and construed by the court reads:

" Said McFadden shall cause all such changes and alterations to be made of first-class materials and workmanship in accordance with the plans and specifications to be prepared as above specified and in strict accordance with

the laws of the State of Michigan and the ordinances of the city of Grand Rapids."

These changes consisted of scenery, dressing rooms, and a fly gallery, and were put in by permission of the proper authorities, and plaintiff, when in making these changes it was discovered that the proscenium arch was a wooden truss, was notified by the authorities of that fact. He put in one of metal and tile as ordered by the authorities, and did not claim that such construction was equally obligatory upon defendant. This was the practical construction of the parties at the time. The clause in the agreement of August 23d had reference to the changes to be made by defendant therein specified, and was no undertaking on his part to conform with the orders of which he had no knowledge. The court was in error in his construction of this agreement.

4. We do not take the view that the firemen were in the building as trespassers merely. The authorities, in the interest of the public safety, had a right to take such reasonable precautions as might be necessary. It is urged that they might close the place, but could not put men in the building to protect the public from danger in case a fire broke out. We are not prepared to say that the action of the officers in putting men in the building was unreasonable or unlawful. In any event it is no defense for plaintiff.

There was some evidence in the case as to the condition of this basement other than in the reports of the officers. It is stated in the testimony of defendant, and plaintiff's letter to the council shows, that he acquiesced in all material respects, although not with any evidence of speedy completion. The first order of the council was made January 18, 1904, and when defendant surrendered the keys June 19, 1906, the requirements of this order were not completed. Defendant leased and went into possession, October 1, 1904, to occupy and use the Auditorium for "a roller skating rink, theater and concert hall." At this time plaintiff knew, and defendant did not know,

that these premises could not be used for the purposes for which they were leased, and he did not disclose that fact. These facts seem to be undisputed. The court was in error in taking the case from the jury.

Defendant pleaded recoupment for damages. He is entitled upon his theory of this case to make proof of such damages as may be proper under the pleadings and circumstances of the case, and to recover such amount as may be found, provided it is determined that he surrendered the premises because of the default of plaintiff.

The judgment is reversed and set aside, and a new trial ordered.

Blair, C. J., and Montgomery, Ostrander, Hooker, Moore, and Brooke, JJ., concurred with McAlvay, J.

Grant, J. (*dissenting*). Mark Norris, one of the plaintiffs, as trustee under the will of Charles Shepard, deceased, and as executor and trustee under the will of Dorinda N. Shepard, deceased, and the other plaintiff, executed to defendant, on September 6, 1904, a lease of the Auditorium, so-called, in the city of Grand Rapids, for the term of one year from and after October 1, 1904, with the privilege of renewing the same from year to year for the further period of four years; the lessee to give the lessor written notice of such renewal on or before the 1st day of May in each year.

The Auditorium was a public hall, used for public entertainments and amusements. It contained a ground floor, balcony, and stage. The basement under the Auditorium was not used in connection with it, but was rented by plaintiffs to private parties—a part to Young & Chaffee, who carried on a furniture business in an adjacent building, and used part of the basement of the Auditorium as a packing room and storing room for mattresses, furniture, etc. Another part was leased to the Grand Rapids Evening Post, and a third part to the New Era Life Insurance Company. The lease contained no covenant to repair, or

any covenant that the demised premises were suitable for the purposes stated in the lease. The lessee covenanted to make repairs. The defendant was an experienced theatrical manager, familiar with places of amusements, their construction, and the usual methods resorted to for the protection of patrons. Defendant went into possession, and from September, 1904, to April, 1905, used the building for a skating rink. In April, 1905, defendant gave plaintiff notice of his intention to renew the lease for another year. The Auditorium was not designed or equipped as a theater; it was used mainly for concerts, political meetings, and the like. Defendant desired to equip the Auditorium for theatrical exhibitions, and he and Mr. Norris as trustee on August 23, 1905, entered into an agreement referring to the former lease, reciting defendant's desire to make certain changes and alterations in the Auditorium, with a view to make it practicable for use as a theater. That agreement required the defendant to make the necessary plans and specifications for the contemplated changes, and to comply with the statutes of the State and ordinances of the city relative to the same. Defendant was likewise to procure all necessary permits for the making of such changes and alterations, and the addition of scenery. He also agreed to make these changes and alterations in accordance with the plans and specifications so prepared, and in strict accordance with the laws of the State and ordinances of the city. The agreement then proceeded to recite certain specific things that he was to do. Defendant was to pay for all these changes and alterations, Mr. Norris agreeing to allow upon rent $1,200 for such improvements, specifying the times when it should be allowed. In case defendant failed to renew his term for the year October 1, 1906, to October 1, 1907, then he was to repay Mr. Norris the amount so allowed. Defendant proceeded to make these improvements, and continued in the possession of the theater until June 18, 1906, when he abandoned the premises. This suit is brought to re-

cover rent due under the lease and the amounts allowed defendant as rent for the improvements.

The defense is that the premises were unfit for the purposes for which they were rented; that the defendant was unable to use them; that the Auditorium had been condemned by the public authorities as unfit, unsafe, and dangerous for the purpose for which it was rented; and that these facts were concealed from the defendant. The facts upon which the defendant relies are as follows: On January 18, 1904, the building inspector and fire marshal, in accordance with a resolution of the common council, had examined the various places of amusement with a view to recommending changes for the protection of the public. They recommended that at the Auditorium there should be put in a wood stairway at the northeast corner of the building, from the sidewalk to the balcony and main floor, a stair leading from the same to the ground; that call boxes be placed in the building, and at least two lines of hose be placed on the main floor, two in the balcony and two on the stage; that all the exposed woodwork in the basement be covered with expanded metal lathing, and two coats of hard plaster; that a cement floor be put in and an automatic sprinkler system installed in the basement. This report was adopted. Mr. Norris built an exit in lieu of the stairway. He put in a double maple floor, lined with asbestos; replastered the basement on metal lath, and, discovering that there were wooden posts supporting the Auditorium floor, he took them out and put in iron columns. These were accepted by the council as sufficient. When defendant was proceeding to equip the theater under the contract of August 23, it was discovered that the present proscenium arch was a wooden truss that spanned the opening, instead of brick. This was removed and a steel truss put in its place. Mr. Norris ordered the automatic sprinkler, but the contractors would not agree to put it in within the time required, as the manufacturers of the valves could not agree to furnish them to the contractor at a specific time. The

material, however, had arrived, and the sprinkler nearly completed before the defendant abandoned his contract. Telephones had been permitted by the council to take the place of the call boxes required. The two lines of hose had been installed upon the stage, but had not been installed on the main floor or the balcony. On February 13, 1906, the committee of the council, among other things, recommended that a division wall between the stage of the Auditorium and that part of the building facing on Fountain street should be constructed of either brick or tile, and carried through and above the roof. This the committee regarded as one of the most essential recommendations. The committee recommended, upon failure to comply with these requirements, that the Auditorium be closed. On June 11, 1906, Mr. Norris sent a communication to the common council, stating that he had endeavored to get the automatic sprinkler installed within the time required, that he had made a contract with the parties to put in as expeditiously as possible, and that the material was then arriving. He also reported that the contract for the hose and pipe for the main body of the Auditorium had been let for a number of weeks, and he did not understand why it had been delayed. He further reported that he was informed by the Iron Works which had the contract, that the material had arrived, and would be put in as soon as possible. He also reported that he could not put in the wall then without driving all the tenants out of the building, because he was obliged to maintain fires as late as the week before for the benefit of the tenants.

Defendant testified as follows:

"*Q.* What is the reason you could not carry on the theater?

"*A.* Because certain improvements had not been made that were ordered.

"*Q.* What improvements?

"*A.* Installing the sprinkler system and hose."

The theater season was practically over, and Mr. Norris had reported to the council that all the improvements

ordered would be completed before the next season opened. The common council, upon the assumption that they had the right to do so, placed several policemen in different parts of the Auditorium during the theatrical peformances. Defendant ran the place without any interference on the part of the authorities from October, 1904, to October, 1905. He commenced work under the second contract in September, and completed the work in about six weeks; his first performance being November 27, 1905. The authorities had not condemned the Auditorium or ordered it closed, or interfered with its occupancy or exhibitions. The special committee of February 13, 1906, recommended that, pending the completion of the changes which they had recommended, the board of police and fire commissioners arrange for a patrol of not less than five experienced firemen to take up and maintain positions in the basement of the Auditorium and the wings of the stage, and such other places as the fire marshal may indicate, but not in the aisles of the Auditorium, and that these men be kept on guard during all hours in which audiences are convened in the Auditorium, and that the proprietors pay the city such compensation therefor as may be agreed upon with said board. This recommendation was adopted by the council. Policemen were placed in the building in accordance with this resolution. At the close of the testimony the court directed a verdict for the plaintiff.

1. Does the rule of *caveat emptor* apply? Undoubtedly anticipating that this rule might be applied, counsel for the defendant sought to establish the fact that Mr. Norris, the landlord, had purposely concealed conditions, known to him but not to the defendant. There is no foundation in fact for this claim. Every nook and corner of the building, its construction, its condition and basement were as open to the inspection of the defendant as to the plaintiff. The building was leased for the same purpose for which it had been occupied for many years, without protest or objection on the part of the municipal authorities. The defendant, an experienced theatrical

man, must certainly be held to have been better acquainted with requirements and surroundings of a theater or place of amusement than Mr. Norris, a lawyer. He is also presumed to have known the laws of the State, and the ordinances of the city, which were as open to him as to the plaintiff. Defendant must have known that municipalities, through their common councils and boards, have certain control over such places and the right to provide reasonable rules and regulations for the protection of the public. These rules and regulations are matters of public record, and were open to the inspection of the defendant. A fire resulting in terrible loss of life had shortly before occurred at the Iroquois theater in Chicago. In all cities throughout the country theaters were being investigated by municipal authorities, and stringent rules and regulations enacted. The city of Grand Rapids was not an exception. The defendant knew, or should have known, this, and if he desired to know what those rules and regulations were before taking the lease, he could readily have done so. He cannot complain now or claim any fraud or concealment on the part of the landlord in not telling him what they were. Mr. Norris was not called upon to speak, and was guilty of concealing no fact which the law required him to state. He was guilty of no wrong in law or morals.

Defendant makes no claim that the building was defective. Every condition now complained of was open to his view. He knew the condition of the basement, or, what is equivalent in law, should have known it. He knew there was no hose in the main floor and the galleries. In other words, he saw the situation, and after his examination entered into a lease which exempted the landlord from any liability to repair, and imposed that liability upon him. In such case the rule of *caveat emptor* applies to a tenant. "His eyes are his bargain." If he desires to protect himself against the requirements of the public authorities, or against inherent and unknown defects, or against present or subsequent conditions of any

kind, he must protect himself by provisions in his contract; otherwise the law gives him no remedy. In the absence of any concealment of known defects, and of any warranty that a building is in suitable condition for the purpose for which it is to be rented, the lessee must make such examination as he chooses for himself, and determine for himself whether the building is suitable for the purpose for which he desires to lease it. The law does not permit him afterwards to say, "The building is not suitable or in proper condition."

The word "demise" in the lease of a house for years "implies a covenant for title in the estate merely; that is, of quiet enjoyment against the lessor and all that come in under him by title." Such a lease contains no covenants against the acts of trespassers or strangers, or the requirements of public authorities having police control over the leased premises. In a leading case upon this subject, decided in 1843, the court say:

"There is no authority for saying that these words imply a contract for any particular state of the property at the time of the demise; and there are many which clearly show that there is no implied contract that the property shall continue fit for the purpose for which it is demised." *Hart* v. *Windsor*, 12 Mees. & W. 68.

This case is cited with approval by many of the courts of this country, and correctly states the rule. *Toner* v. *Meussdorffer*, 123 Cal. 462 (56 Pac. 39); *Watson* v. *Almirall*, 61 App. Div. (N. Y.) 429 (70 N. Y. Supp. 662); *Moore* v. *Weber*, 71 Pa. 429 (10 Am. Rep. 708); *Town* v. *Thompson*, 68 N. H. 317 (44 Atl. 492, 46 L. R. A. 748); *Gallagher* v. *Button*, 73 Conn. 172 (46 Atl. 819); *Howell* v. *Schneider*, 24 App. Cas. (D. C.) 532, and authorities there cited.

The contract of leasing contained no implication that the landlord should make changes that the common council should demand or deem expedient. The landlord had agreed to furnish nothing but the room leased in the condition in which it then was. The lessee assumed the risk

of conditions which the common council might legitimately impose, or had imposed. Under this lease the rule of *caveat emptor* applies, and the defendant has no ground of complaint against his landlord for the condition of the building, or failure to comply with the requirements of the common council. It is proper, and just, also, to here remark that the plaintiff had substantially complied with all the requirements of the common council under their resolution and ordinance of February, 1904, except as to the sprinkler and the hose in the main floor and in the balcony.

2. We have substantially decided the second question presented in what has already been said upon the first, and but little need be said upon it. That question is, Did the lessor in this case impliedly warrant that the premises were tenantable and could be safely and conveniently used for the purposes for which they were rented? That question has been settled by the decisions of this court, holding that such lease contains no implied covenant as to the condition of the demised premises or their fitness for the use intended. *Clark* v. *Babcock*, 23 Mich. 164, and authorities cited in note 3; *Rhoades* v. *Seidel*, 139 Mich. 608 (102 N. W. 1025); *Hart* v. *Windsor, supra; Auer* v. *Vahl*, 129 Wis. 635 (109 N. W. 529). In *Hart* v. *Windsor*, the defense was that the tenement was not reasonably fit for use, being infested with noxious insects. After stating the rule that there was no implication by law that the demised property was fit for the purpose for which it was let, the court say:

"It is much better to leave the parties in every case to protect their interests themselves by proper stipulation, and if they really mean a lease to be void by reason of any unfitness in the subject for the purpose intended, they should express that meaning."

Other English authorities are to the same effect, but we need not cite them. The same rule is held in the courts of the United States. Mr. Justice Gray, in *Leavitt* v. *Fletcher*, 10 Allen (Mass.), 119, said:

" It is well settled that in a lease of real estate no covenant is implied that the lessor shall keep the premises in repair, or otherwise fit for occupation."

So it is distinctly held in *Jaffe* v. *Harteau*, 56 N. Y. 398 (15 Am. Rep. 438), that, in the absence of fraud or any agreement, there is no implied warranty that the premises are tenantable or fit for the use for which they are to be leased, citing several authorities. In *Keates* v. *Earl of Cadogan*, 10 Com. B. (N. S.) 591, the declaration stated that the demised premises were at the time of letting in a ruinous and dangerous condition, and the plaintiff was without any knowledge or information upon this subject, and that the defendant, the landlord, let the house to plaintiff without informing him of its condition. Upon demurrer the court said:

" It is not pretended that there was any warranty, express or implied, that the house was fit for immediate occupation, but it is said that, because the defendant knew that the plaintiff wanted it for immediate occupation, and knew that it was in an unfit and dangerous state, and did not disclose that fact to the plaintiff, an action of deceit will lie. The declaration does not allege that the defendant made any misrepresentation, or that he had reason to suppose that the plaintiff would not do what any man in his senses would do, viz., make proper investigation, and satisfy himself as to the condition of the house before he entered upon the occupation of it. There is nothing amounting to deceit; it was a mere ordinary transaction of letting and hiring."

Same holding in *Bowe* v. *Hunking*, 135 Mass. 380 (46 Am. Rep. 471); *Bennett* v. *Sullivan*, 100 Me. 118 (60 Atl. 886); *Doyle* v. *Railway Co.*, 147 U. S. 413 (13 Sup. Ct. 333). The well-nigh universal rule is that, in the absence of fraud or misrepresentation, the tenant takes the property as he finds it, and assumes all risk of its being fit for the purpose for which he rents it. We will not multiply authorities.

3. As between the plaintiff and defendant, lessor and lessee, no obligation rested upon the plaintiff to make the

extensive improvements directed by the common council. *Cooper* v. *Lawson*, 139 Mich. 628 (103 . N. W. 168). The fact, however, that he voluntarily did undertake to make them did not operate to change the terms of the original lease, and impose upon him the obligation which was not imposed by the lease. *Watson* v. *Almirall*, 61 App. Div. (N. Y.) 429 (70 N. Y. Supp. 662).

Under the defendant's own showing, I do not think he is entitled to recover, even if the obligation had rested upon the plaintiff to comply with the resolutions of the council. He had complied with nearly all of them. The defendant was compelled to admit that he abandoned the premises because the sprinkler plant was not installed in the basement, and because the hose were not in the main floor and the balcony of the Auditorium. These were the sole causes for complaint. He knew or might have known that the sprinkler system was nearly completed, for he had access to the building, and testified that he was there some days before the abandonment. When the common council insisted on these improvements being made, Mr. Norris used due diligence to secure them. The theatrical season was practically ended, and no serious harm would result if the sprinkler plant had not been installed immediately. He had also let a contract to put in the hose, and it was not his fault that the contract had not been complied with. The contract shows that this improvement was shortly to be made. He had suffered no loss in the past, or, if he had, his remedy was by action to recover damages. As to the future, the improvements were so nearly completed as to remove all ground for any claim to an eviction. An eviction, however, must be grounded upon the violation of some duty of the landlord, and not of strangers or trespassers. Plaintiff was not responsible for placing policemen in the hall during plays. (The record does not show how many were in the hall, or how conspicuous they were, or how often they were present; neither does it show that patrons would understand that they were present to act in case of fire.) He did not

request such action by the council or give approval of it. He was in no sense a party to it. So far as this record appears, the appearance of policemen is the only act which might tend to interfere with the attendance at entertainments. But there is no evidence that it did interfere.

I think the case should be affirmed.