GEORGE REYNOLDS, Plaintiff, Appellee, v. SKELLY OIL COMPANY, a Corporation, and JAY WATSON, Defendants, Appellants.

No. 44900.

164

OCTOBER 17, 1939.

Shull & Stilwill, for appellant Skelly Oil Company.

Gunnell & Bergeson, for appellant Jay Watson.

. E. O. Bundy and O. D. Nickle, for appellee.

HAMILTON, J.—Eight separate grounds of negligence are charged in the petition as follows: (1) That the said Jay Watson was negligent in that he knew the place in which he

asked the plaintiff to stand when he was fixing the tire was not a safe place to stand while doing such heavy pounding; (2) that the defendant knew the plaintiff herein was in close proximity and should have known that to strike with such force with the plaintiff so near to the tire was careless, reckless and jeopardizing the safety of his customer; (3) that the defendant knew that the hammer which he was using was old and brittle and that particles from the same had often broken from the pole of said hammer; (4) that the defendant failed to use due care for the safety of his customer·while pounding and working upon said tire; (5) that the defendant, Jay Watson, was pounding metal against metal and did not use due care in warning his customer that particles might fly and strike him in the face or body; (6) that the hammer, which defendant Watson used, was battered around the face of the same and the said defendant knew that a hard blow or glancing blow would cause particles to fly into the air; (7) that the defendant employee was not skillful in his work and did not use proper care in placing said tire upon the wheel; and (8) that the plaintiff, at the time he received the injury complained of, was an invitee of the defendants and the defendants failed to exercise the care required under such conditions.

It is the contention of appellants that the trial court erred in overruling their motions for directed verdict in that the evidence failed to show (a) that Jay Watson was an employee of the Skelly Oil Company, (b) failure to prove Watson was guilty of any negligence which was the proximate cause of appellee's injury, and (c) that plaintiff failed to prove his freedom from contributory negligence.

█ Before the plaintiff was entitled to recover against either of said defendants, it was necessary to show by the evidence that Watson was negligent in some of the particulars relied upon; that such negligence was the proximate cause of plaintiff's injury; and that plaintiff was free from contributory negligence. In order to recover against the defendant, Skelly Oil Company, it was necessary to prove that Watson was an employee of said company.

█ The question to be determined is whether or not plaintiff sustained his burden in the foregoing particulars. In determining this question, plaintiff is entitled to have the evidence

construed in the light most favorable to him. We have carefully read the entire record and it is our conclusion that the appellants' contentions are well founded and the motions to direct a verdict for the defendants should have been sustained.

■ We might stop here but prefer to substantiate our conclusion which will require that we set out the evidence. Briefly summarized, the evidence shows that the Skelly Oil Company leased some ground, on which it erected a filling station, in the small town of Smithland, Woodbury county, Iowa. It leased this station, under a written lease, to a Mr. Carry. Carry became indebted to the company and, about a month before his lease expired, he turned over his tools and equipment, which he then owned, to the company and arrangements were made between Carry and the company's agents whereby defendant Watson was left in charge of the station, running the same for Carry until the end of the lease, at which time, to wit, October 1, 1937, the company, through its agents, undertook to lease the station to Watson. A written lease was prepared, bearing date of October 1, 1937, wherein Watson was named as lessee and which was signed by Watson and forwarded to the company for its approval. At the same time an inventory was taken, listing the company's belongings, which included the equipment acquired from Carry, under the following heading:

"List of all improvements, equipment, appliances, tools, tanks, furniture, and other personal property received by lessee from lessor in good condition."

This was attested as correct by V. H. Reed, salesman, and signed by the Skelly Oil Company, lessor, and by Jay Watson, lessee. It seems that the company required its tenants to execute a bond for the faithful performance of the covenants of the lease and for the preservation and return of the equipment in good condition to the company at the expiration of the lease and such a bond was executed by Watson and accompanied the lease. Watson knew that the lease and sureties on the bond would have to be approved by the company at its home office in Kansas City, Missouri, before this written lease would become effective. The whole difficulty in this case, in so far as the Skelly Oil Company is concerned, arises because

of the fact that the sureties on this bond were rejected and Watson was unable to obtain additional sureties satisfactory to the company. In the meantime, he was in possession of this oil station and continued in possession for some time thereafter and the question presented is: What was his relationship to the Skelly Oil Company—that of an employee or a lessee? Naturally, the company was desirous of keeping the station in operation. During the month that Watson was running the station for Carry, the company continued to deal with Watson by furnishing gas, oil, grease, etc., Watson paying cash for the same and taking the profit from the sales. Watson stated that he was to keep it open for Mr. Carry under an arrangement with him. "It was just merely an agreement that I was to finish Mr. Carry's obligation for the year's lease. I was supposed to be working for him." There is some confusion in the plaintiff's evidence as to just what were the exact terms and conditions of the arrangement between the officers of the company and Watson during the time Watson was in the station and pending the execution and approval of the lease and bond on behalf of the company, but we think the question is quite clearly presented by the testimony of Mr. Duncan, who was at that time employed by the company as manager of tank sales and salesman. Duncan relates a general conversation in which the district manager, Mr. Reed, Duncan and Watson took part relative to this matter, which establishes quite conclusively that Watson was not employed, that he was not to receive any wages, but was to operate the station just as Mr. Carry had operated it, as a lessee. We quote from the record:

"In regard to the operation of the station between the time we found Carry gone and the time the lease would be secured by Mr. Watson, the conversation as to how the station would be handled in the meantime was as follows: He said, 'Go ahead and run it and keep it open,' and whatever business he got till he could secure his lease and raise the money to handle the station he could have. He said he could have all the commission that he made till he got the lease. That was the only way he could get paid, was just whatever he could make. * * * He wouldn't have to pay any rent. * * * There was something said in that conversation in relation to how the station would be handled pending the execution of

the lease or the securing of the lease. In regard to that matter there was the following conversation; he said he could pay for his merchandise that he had in there so much a month if the lease went through he could pay it out in monthly payments, and the merchandise was in there and it would be his. * * *

"Q. And that Watson could operate the station just like, you say, like Mr. Carry had been operating it, until this written lease was signed? A. Well, he said, 'Go ahead and run it and keep it running the same as if he had it leased himself.'

"Q. In other words, he was to operate it just as if the written lease had been signed? A. That's right. In other words, the price he was to pay for gasoline and the way that business was to be handled, he was to do it just the same as if the lease was accepted, except the rent. I was to treat Mr. Watson, so far as delivering gasoline to him was concerned, and merchandise, just as if the lease had been signed and accepted. The company could terminate that relationship at any time up until the lease was signed. * * * Watson said that arrangement was all right. He paid me for the gasoline and merchandise just as if the lease had been signed."

This witness further testified that:

"The purpose of signing the papers and lease in those transactions was to lease him a station so he could go ahead and run it himself."

Reed's testimony, given as a witness for defendants, is substantially to the same effect.

The record shows that, after this lease was signed, Watson took out a state permit in his own name from the state treasurer to sell gasoline and also from the State Board of Assessment and Review to collect a retail sales tax, paying the license fees himself. The station was equipped with electric current and he made arrangements regarding the purchase of electric current. The meter was in his own name and he paid the charges for electric service. This was also true as to water furnished by the city. The record shows, without dispute, that, during all the time he was in the station, he bought gas, oil, grease, and accessories from the Skelly Oil Company and paid for the same when they were delivered. The record also shows that Watson handled and sold products which he purchased

from other concerns. The company required him to pay cash for his oil and supplies and they exercised no supervision over him as to his method of retailing the same. Duncan testified that he and Reed "tried to help Watson; showed him how to keep his books and to keep track of his money and stuff like that. Just helped him. Just suggested things to help him." Duncan further testified that, after Watson took the station, he then proceeded to deliver oil and gasoline to Watson; billed it Jay Watson and Watson paid for it when he got it in cash. He had to pay cash for gasoline and that ended it. It didn't make any difference to Duncan what he did with the gasoline; he could sell it for cash and collect for it or on account too in case he wanted to. It was his merchandise. Whenever he needed gasoline, Duncan stopped and delivered it and Watson paid him for it and that transaction would be closed. He delivered supplies to him whenever he needed them; sometimes twice, sometimes three times a week. Duncan said he did not know what time Watson opened the station in the morning or when he closed it at night; that Watson hired persons to help him and that was none of the company's affair; that Watson could hire whom he pleased and pay whatever wages he wanted to and hire and fire as he pleased; that he never made any suggestions to Watson as to how he should change tires or do that kind of work or in repairing tires and such things; that that was Watson's own business; that he could do it any way he wanted to as far as Duncan or the company was concerned.

Watson operated the station in this manner for 8½ or 9 months, during which time, to wit, May 12, 1938, the accident happened. At the time of the accident, the sureties on the bond had been rejected by the company.

 Watson paid no rent. This was not essential to the creation of the relation of tenant. 35 C. J. 951; Doyle v. Union Pac. R. Co., 147 U. S. 413, 13 S. Ct. 333, 37 L. Ed. 223. When he ceased operating the station, he turned the equipment back to the company and the station was closed. Something is said in argument concerning the display of Skelly signs but these are explained by the witness Reed as being more or less in the nature of Skelly trademark signs and merely intended to show that Skelly merchandise was being sold at that particu-

lar place and that all dealers selling Skelly merchandise were furnished with such a sign, if they wanted it. The sign consisted merely of the word "Skelly". There was also a small sign "Tire Repairing" with an arrow pointing toward the station; this was also furnished by the company, so the witness stated, where the operator desired to do that kind of work. Such was the testimony on the part of the plaintiff bearing on this question and, to say the least, it falls far short of establishing the relationship of employer and employee. In fact, it establishes exactly the opposite.

No case on all fours has been cited, but the cases dealing with the question of independent contractors, which are quite analogous, lay down the rule which has been uniformly followed in this state. In re Estate of Amond, 203 Iowa 306, 308, 210 N. W. 923, 924, we said:

" * * * the test quite uniformly applied in this state is: Does the employee represent the master as to the result of the work only, or as to the means by which the result is obtained? If as to the result, and in the employment of the means he acts entirely independently of the master, he must be regarded as an independent contractor. Overhouser v. American Cereal Co., 118 Iowa 417. In all of the cases decided by this court, particular emphasis has been given to the right of the employer to dictate and control the manner, means, and details of performing the services. Hoff v. Schocley, 122 Iowa 720; Humpton v. Unterkircher & Sons, 97 Iowa 509; Miller v. Minnesota & N. W. R. Co., 76 Iowa 655; Parrott v. Chicago G. W. R. Co., 127 Iowa 419; Francis v. Johnson, 127 Iowa 391. The foregoing tests appear to us as the more logical and satisfactory. Unless the employer has the right to direct the manner and means of doing the work, and has the right of control over the employee, the doctrine of respondeat superior is not applicable. Callahan v. Burlington & M. R. R. Co., 23 Iowa 562. An essential element of this doctrine is the right of control by the master or employer over the servant or employee. Brown v. McLeish, 71 Iowa 381; Kellogg v. Payne, 21 Iowa 575."

To the same effect, see Norton v. Day Coal Co., 192 Iowa 160, 180 N. W. 905.

Cases such as Lembke v. Fritz, 223 Iowa 261, 272 N. W. 300; Mallinger v. Webster City Oil Co., 211 Iowa 847, 234 N. W. 254; and similar cases cited and relied upon by appellee present entirely different fact situations. The rule of law announced in these cases is identical with that heretofore quoted from the Amond case, 203 Iowa 306, 210 N. W. 923.

■ The argument of appellee that the Skelly Oil Company was estopped because of the signs displayed and that, because of such signs, there was a presumption that the station was owned by the Skelly Oil Company has no support in reason or authority. As well argue that, because the word "Chevrolet" or "Buick" is displayed in front of a place of business, General Motors would be estopped to claim that it was not the owner of the business. It is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers.

■ We turn now to the question of negligence on the part of defendant Jay Watson. We quote from the testimony of the plaintiff:

"I drove up there and stopped. I had a tire soft on the front of my truck. I just stopped and told the boy to fix it; and he proceeded to take the wheel off, and he had some trouble in getting the tire off; and then he took the rim off and the tire off and the tube out and took it inside and put a hot patch on it. He had trouble in putting it back on the rim, too, after he put it in the casing again; he was having trouble with the casing; the wheel of the car laid on the pavement, and he pulled the valve stem toward the hole in the iron rim, and then he was having trouble to get the rim down. That was what he was working at when I got hurt. He was working that casing down into that rim; it was a big heavy wheel, understand, the front wheel of the truck; and of course, I was expecting the thing to fall into place in the rim; and I was standing there right close to it watching him; and he had a tire tool; there was more tools laying around there, but at any rate this particular one he had in his hand was round on one end and the other end was flat, and with that iron bar he worked getting this tire down, and he had a hammer there, and as he would hit it on one side with the hammer it seemed as though it would come up a little on the other; and I stood

by there close and he asked me to hold that side down; I stepped over and took hold of the tire with my two hands, and then he hit the tire tool that he had in his hand with the hammer; I don't know whether I got struck at that instant or whether he hit it a second time or a third time, but that is the time I got hit, and it struck me right there in the eyelid and went through the eyelid and into my eyeball. * * * There wasn't much said about it, only we just talked about how it hurt; and we walked over to where the hammer was laying there, and two or three of the boys were around there, and I noticed the hammer chipped off a little around the nose of it, and I called their attention to it; I think that is about all there was said about it. * * * At the time I received the injury I was stooped over on my feet, down low, and had hold of the tire, feet and knees straight, just drawing my feet close to jerk it a little to make it better fall down, when I got hit. Jay Watson was just the distance of the tire away from me at that time. I wouldn't say how far, but probably about three feet. He was on the opposite side of the tire.''

The foregoing is the sum and substance of the plaintiff's case insofar as negligence is concerned. No other witness was placed on the witness stand by the plaintiff to give evidence concerning the method of making the repair or as to how the accident occurred. It would seem clear that there was an entire absence of proof of negligence on the part of Watson as to any of the grounds set forth in the petition and that the motions for directed verdict at the close of the plaintiff's testimony should have been sustained.

When we turn to the evidence of the defendants, we find nothing to aid the plaintiff on the question of negligence. Watson testified that, in making the repair, he had two tire irons, a hammer and a block upon which the wheel was laying. It was an unbreakable, 16 ounce, claw hammer. The tire tools or irons were such as they ordinarily use anywhere with a round handle and flange end. The hammer had a steel handle wrapped with rawhide as a grip. Watson was pounding on the iron tool with this hammer at the time plaintiff received his injury. Aside from the fact that it was afterwards discovered, on that day either at the time of the injury or shortly thereafter, that there was a small chip off of the ''pole'' (the

part that hits the nail) of the hammer, there is nothing in the record to show just what the particle was that flew into the plaintiff's eye. Watson said he did not know when this chip came off. It had never been called to his attention before; "it could have been out for some time."

An X-ray was taken some two weeks after the injury occurred and the doctor testified that the X-ray simply showed a foreign object which was nonmagnetic; that is, it could not be picked up with a magnet. The foreign object was not found. The doctor stated that it had had enough time to oxidize so that it would have been impossible to find it. It had apparently gone clear through and was in the sclera of the eye itself and had decayed, just like rust so that the X-ray would show a shadow; that the particle was quite minute—about a millimeter in width or about the width of a line; that he could not tell whether this particle was metal from the X-ray examination. Plaintiff assumed that it was a chip off this hammer and told the doctor as much but no one knew what it was or where it came from and, aside from the one fact that there was a chip out of the "pole" of this hammer, there is nothing to indicate where this particle came from that entered the plaintiff's eye. But, if we assume that this circumstance was sufficient upon which to base an inference that it was a chip off the hammer, where, in this testimony, is there anything upon which the jury could base a verdict that it was chipped off because of the negligent conduct of Watson?

There is no evidence as to the force of the blow of the hammer or of his method of using it; neither is there any evidence as to the method used or the tools and appliances used to show that they were not the usual and ordinary tools and usual and ordinary methods. In fact, the evidence shows to the contrary. We have set out all the evidence bearing on this subject. No one testified that there were any better or safer tools or method of using them or that there was any safer place in which to change this tire; neither is there anything in the nature of the tools or the method of using them or the place where they were used of such an inherently dangerous character as to call for a warning on the part of Watson. It was a simple ordinary operation, perhaps, undertaken many hundreds of times daily throughout the country as everyone

knows. Any danger inhering therein could not help but be as equally apparent to the plaintiff as to the defendant Watson. Whatever peril there was was as obvious to one as to the other and the plaintiff most certainly voluntarily placed himself in whatever position of peril that existed and would be as equally guilty of negligence as the defendant and this would also defeat his recovery for it was incumbent on him to show his freedom from contributory negligence.

There is nothing in the record to show that any special skill or training was required to repair this tire. The records show that this young man Watson had had considerable experience in changing truck tires; that he had driven a truck for 13 months and looked after it and had been around repair shops and observed how the work was done and the tools that were commonly used.

Manifestly, verdicts may not be allowed to stand unless they have support in the evidence.

The law governing such matters is that the defendant was under a legal obligation to exercise reasonable and ordinary care to see that his place of business was reasonably safe for those who were invited thereon and to the plaintiff in particular. Graham v. Ochsner, 193 Iowa 1196, 188 N. W. 838. This was the duty which defendant owed to the plaintiff but, in the instant case, there is no proof of failure by the defendant to perform this duty, hence, no actionable negligence because of any breach of any duty owing by defendant to the plaintiff and without such there can be no recovery. Upp v. Darner, 150 Iowa 403, 130 N. W. 409, 32 L. R. A., N. S., 743. Plaintiff's evidence makes no attempt to show that the way in which the work was done was either dangerous or unusual or that the tools used were either dangerous or unusual. Reasonably safe means safe according to the usage, habits and ordinary risks of the business. Defendant was not held to a higher degree of skill than the fair average of the trade and the standard of due care is the average prudent man. Titus v. Bradford, B. & K. R. Co., 136 Pa. 618, 20 Atl. 517, 20 Am. St. Rep. 944. There is no evidence in this case to show that the replacing of this tire upon the rim by the use of the tools described and in the manner used was not the ordinary and usual way of doing this work There was, therefore, nothing to submit to

the jury. It was an unfortunate accident, but, under this record, there is no legal basis for recovery of damages against the defendants.

It follows that the trial court erred in not sustaining the motions to direct a verdict and the case must be and is reversed.—Reversed.

CHIEF JUSTICE and all JUSTICES concur.