## CLAUDE J. MABE *v.* B.P. OIL CORPORATION

[No. 341, September Term, 1975.]

*Decided April 14, 1976.*

The cause was argued on November 21, 1975 and reargued on March 23, 1976 en banc before ORTH, C. J., and MORTON, MOYLAN, POWERS, GILBERT, MENCHINE, DAVIDSON, MOORE, LOWE, MELVIN and MASON, JJ.

*Peter Parker* and *Gordon W. Priest, Jr.,* with whom were *White, Page & Lentz* on the brief, for appellant.

*B. Ford Davis,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court. POWERS, J., concurs and filed a concurring opinion at page 236 *infra.* MELVIN, J., dissents and filed a dissenting opinion at page 237 *infra.*

"A large portion of the transactions of the modern business world is carried on by simple and informal means. A word or look or gesture often suffices to give assent to great undertakings or to set in motion the complicated machinery of commerce. Little, often, is said or written, but that little carries with it a train of legal consequences no less certain and definite than if the whole were included in the spoken or written words. This being so good faith is strenuously insisted upon, and one who by his conduct has led an innocent party to rely upon the appearance of another's authority to act for him, will not be heard to deny the agency to that party's prejudice. Hence it is that in many cases the existence of an agency is implied or presumed from the words or conduct of the parties, and this, too, although the creation of an agency was not within their immediate contemplation."

"It may therefore be stated as a general rule that whenever a person has held out another as his agent authorized to act for him in a given capacity;

or has knowingly and without dissent permitted such other to act as his agent in such capacity; or where his habits and course of dealing have been such as to reasonably warrant the presumption that such other was his agent, authorized to act in that capacity; whether it be in a single transaction or in a series of transactions, his authority to such other to act for him in that capacity will be conclusively presumed, so far as it may be necessary to protect the rights of third persons who have relied thereon in good faith and in the exercise of reasonable prudence, and he will not be permitted to deny that such other was his agent, authorized to do the act that he assumed to do, provided that such act is within the real or apparent scope of the presumed authority." Mechem on Agency, §§ 83, 84. (1st ed. 1888).

These are the observations of Floyd R. Mechem, expressed in 1888, in his classic work on *Agency*. He further indicated in a later edition that because of the necessity of proving the element of reliance, the application of the doctrine in tort cases was limited at best.

"Reliance upon appearances, however, does not ordinarily induce to assault, slander, trespass, or negligent injury, and the cases must be rare, if any, in which it could be an element." Mechem, *supra*, § 724 (2d ed. 1914).

That observation was perhaps fitting in context of the times over a half century ago, before the conformity demands of national franchise merchandising. There subsequently have developed refinements to the doctrine of "apparent agency" and the related doctrine of "agency by estoppel", but the basis for liability remains relatively unchanged — that one should be bound by, and responsible for, his assertions.

The line of demarcation between apparent agency and agency by estoppel is not always clear, *Reserve Ins. Co. v. Duckett*, 240 Md. 591, 600, since both theories require essentially the same elements: outward manifestation by the

"principal" that an agency relationship exists upon which the one seeking to recover has reasonably relied.[1] When invoking agency by estoppel, however, one must also show a change of position by the third person such that it would be unjust for the purported principal to deny his words or manifestations. Restatement, *Agency*, 2d, § 8, Comment d. While agency by estoppel is generally used in tort actions and apparent agency in actions based on contract, that usage is not mandatory.

Although there is no Maryland case law dealing with the liability for tortious acts of apparent servants, the definition adopted by the Court of Appeals to describe apparent authority or authority by estoppel in cases based on contractual liability is sufficiently comprehensive to include tort liability as well. The general principle was stated by that Court in *Hobdey v. Wilkinson*, 201 Md. 517, 526.

> "One who knowingly permits another to act for him as though authorized, inducing third persons to rely to their disadvantage on the seeming authority, is estopped from later asserting the lack of authority of his apparent agency."

See also *Reserve Ins. Co. v. Duckett, supra*, at 600-601. The definition adopted by the American Law Institute in the Second Restatement of Agency is basically the same as Maryland's definition, but utilizes language associated with the law of torts:

> "One who represents that another is his servant or

---

1. Unhappily the overall misuse of the terminology in the development of agency doctrine may lead a researcher down the wrong legal road. The Restatement, *Agency*, 2d, § 8, Comment e helps clarify some of the terms:

". . . apparent authority has an entirely different meaning from inferred or implied authority. The latter terms are merely descriptive of the way in which authority is created, whereas apparent authority is not necessarily coincidental with authority. In fact, apparent authority is generally inferred or implied from manifestations of the principal to third persons, and hence it is correct to speak of implied or inferred apparent authority in most of the situations where apparent authority exists. Ostensible authority is merely a synonym for apparent authority and is so used by many courts."

other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." Restatement, *Agency*, 2d, § 267.

The case before us on appeal presents a classic example of facts giving rise to liability based on apparent authority. It is for this reason that we have briefly reviewed the law — that our recital of those facts may be viewed in its proper context.

## The Case Before Us

Claude J. Mabe testified that, while driving with his father and brother in Baltimore City, they noticed that their automobile needed both gas and water.

"Q Now, you say that you needed gasoline and water? You pulled into where?

A Hilton BP filling station.

Q Were there any other gas stations in that same area?

A Yes, sir.

Q Where were they?

A There was an Exxon on the left-hand side and Gulf station up the — just up the street a little farther.

Q Why did you choose the BP station?

A Because I always buy BP gasoline, always deal with BP.

Q Had you dealt with BP before?

A Yes, up on 29th Street and Greenmount Avenue. I[t] was right around the corner from where I lived at.

Q How often had you dealt with them?

A I had been dealing with them for around about a year at that time.

Q Was there anything in particular you — attracted you to the BP station on Hilton Street?

A Nothing except for the BP station, had BP signs, BP gas, BP pumps.

Q Was there any sign up that said anything about being operated by anybody other than BP?

A No, sir.

Q Now, when you drove into the station, what was the first thing that happened?

A Well, the car was on hot so I asked the man for, you know, water to put in the radiator and he handed me a container which I thought was water and so did he, apparently.

Q Can you describe the container?

A It was a regular water can with a spout on it.

Q And what did you do then?

A I raised the hood, put it in the radiator and it went down in the radiator and came back up and went on the motor and then it exploded."

The can was presumably filled with gasoline or some equally volatile liquid. As a result of an injury sustained, Claude J. Mabe sued the B.P. Oil Corporation (B.P.). A jury of the Superior Court of Baltimore City returned a verdict in his favor and awarded $2800 in damages. The trial judge subsequently granted B.P.'s motion for judgment n.o.v. and denied Mabe's motion for a new trial which he had filed because of dissatisfaction with the size of the monetary award. Mabe brought the present appeal from the final judgment (n.o.v.), arguing that there was sufficient evidence to provide a jury question, either of the existence of an actual agency relationship between B.P. and the station operator, or of an apparent agency based on manifestations thereof by B.P., upon which appellant relied.

As the granting of appellee's motion for a judgment n.o.v. was, in effect, a granting of its previous motion for a directed verdict, we must determine whether the evidence and the reasonable and proper inferences to be drawn

therefrom were sufficient to require the submission of the issue to the jury. *Lewis v. Accelerated Express*, 219 Md. 252, 255. In doing so, we must "resolve all conflicts in the evidence in favor of the plaintiff and must assume the truth of all evidence and inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover — that is, the evidence must be viewed in the light most favorable to [appellant Mabe]." *Smith v. Bernfeld*, 226 Md. 400, 405; *Hagan v. Wash. Sub. San. Comm'n*, 20 Md. App. 192.

Neither side disputes the negligence of the station attendant who handed Mr. Mabe the water can. Thus, we will treat here only the question of whether there was sufficient evidence to provide a jury question as to the existence of an agency relationship between B.P. and the operator of the station.

## Manifestations by the Principal

To hold an apparent principal responsible for acts of an apparent agent, it is necessary to show something more than a mere holding out by the apparent agent of an appearance of such a relationship. It must be shown that the principal knew, or should have known, that the agency relationship was being so espoused and, having such knowledge, that the putative principal condoned, permitted, encouraged, constrained or compelled its continuance. There was evidence in the case at bar that B.P. retained, through a convoluted lease arrangement, substantial, overt and subtle controls over the advertising and physical appearance of the Hilton Street station. In addition to the leases, which were admitted into evidence, the testimony of a B.P. representative explained how, and the extent to which, the rights retained by B.P. in the leases were exercised. The evidence so produced showed, not only knowledge, but encouragement of the prominent display of the B.P. trademark and other manifestations of control over the station. The various leases and the dealer agreement [2] which

2. B.P. Corporation was the assignee and purchaser of these agreements from "Arco, Atlantic-Richfield"] who, in turn, had purchased them from the Sinclair Refining Company.

were introduced into evidence further demonstrated that B.P. assumed tight control of the business activities of appellant. See, *e.g., Singleton v. International Dairy Queen, Inc.,* 332 A. 2d 160 (Del.).

Benkert Realty Company was the owner of the gasoline station property. It had originally leased the property to one of B.P.'s predecessors in interest (all of whom we shall hereafter refer to collectively as the oil company) for whom Lonnie Faison worked as a station attendant. Upon the expiration of that lease to the oil company, an arrangement developed whereby Faison leased the premises from Benkert. As part of the same transaction, Faison then leased the premises to the oil company who immediately leased it back to Faison. At the time of these simultaneous transactions, Faison also entered into a "Dealer's Agreement" with the oil company which was a franchise agreement to sell tires, batteries and accessories. The rental for both lease agreements was determined and paid through the purchase and sale of gasoline, which was controlled by a minimum purchase requirement in the "Dealer's Agreement." For each gallon of gasoline purchased by Faison from the oil company, it would pay him two cents as its rental for the lease *from* Faison. Faison would pay to the oil company one-half cent per gallon as rent under its lease *to* Faison.

The leases and the agreements contain myriad clauses, among which are some relevant to the issue of appellee's representations that Faison was its agent. A lease covenant required Faison as lessee:

> ". . . to promote diligently the sale of gasoline, other petroleum products, tires, batteries, accessories and merchandise, and to keep the station open for business and properly illuminated. . . ."

The promotion of B.P products was accomplished by use of a B.P. trademark consisting of those letters colored green and yellow and which, according to testimony, was exhibited on a "great big beautiful lit sign at night," hung at the

station but owned by B.P. Corporation. No signs except B.P. signs were on the premises.[3] Moreover, the B.P. trademark was also emblazened " . . . on the oil cans and on the pumps [which appellee also owned] and everything . . .", including the attendant's uniform. The lessee was permitted, if not encouraged, to adapt that trademark to all of his equipment including vehicles used at the station.

The lessee, Faison, was not permitted to use the premises for any major repairs or maintenance of motor vehicles without express written permission from B.P., nor was he permitted to affix any sign, fixture or device to the station without prior consent. The dealer's agreement required Faison to purchase annual minimum quantities of gasoline (both regular and high test), kerosene, heating oils, motor oils and anti-freeze. The purchase of tires, batteries and other accessories was provided for, but not required, under another agreement.

The lease reserved a right of entry for B.P. representatives, agents and employees for the purpose of examination and inspection. It was testified that this was carried out by a sales representative who would periodically check the stock,

> "Also, to help the dealer as far as the — if he is having problems of making a go of it, give him suggestions as to what he should do, to perhaps improve the business and check to see what if anything is in repair work, like a pump may not be working. It may be necessary to call me [an administrative assistant] or a mechanic or something of that nature."

The means of enforcing the lease provisions was termination for breach. Presumably the "suggestions" of the company

---

**3.** The lease from the oil company to Faison required Faison to display continuously on the exterior of the station a sign indicating that he was the sole owner of the business. The testimony affirmatively indicates that no such sign was displayed. B.P.'s right of examination and inspection, carried out by its sales representative, afforded them the knowledge, actually or constructively, that no such sign was present, the responsibility for which is chargeable to them.

representative could be enforced by the ever-present threat of non-renewal of the lease from B.P. to the operator at its termination.[4]

In addition to the representations by sign, emblem, etc., at the station proper, the B.P. trademark was used in national and regional sales campaigns and in advertising on television and in periodicals. There was also in the yellow pages of the Baltimore telephone book a "BP column and under it were all these [station] addresses." Promotional gimmicks such as the sale of certain types of flags and glasses were also carried on at some B.P. stations.

We think that the cumulative effect of this evidence of the imprimatur of ownership, intentionally and purposefully exhibited to attract the public's patronage, was sufficient to generate a jury issue as to the "outward manifestations" element of apparent agency.

In the language of the Restatement, *Agency*, 2d, §27:

" . . . apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

Courts of other jurisdictions have found similar manifestations indicative of an apparent agency relationship. In *Standard Oil Co. v. Gentry*, 1 So. 2d 29 (Ala.), it was held that such manifestations as "[t]he sign exhibited to the public, the license exhibited in the office, both the telephone and city directory," were sufficient for a jury question. *Union Oil Company of California v. Crane*, 258 So. 2d 882, 887 (Ala.) found "even stronger" facts than "the facts in [*Gentry*] pertaining to a holding out that this was the oil company station," in the facts that there was a

---

4. This relationship may have provided B.P. with enough control over the operator of the station to create an actual agency between the two. We do not reach that issue, however, since we have concluded that there was sufficient evidence of an *apparent* agency to support the jury's verdict.

large sign indicating that the station was a Pure Oil station, the station sold many Pure Oil products, and the service station operator wore a Pure Oil Company uniform. See also *Chevron Oil Company v. Sutton*, 515 P. 2d 1283 (N.M.); *Gizzi v. Texaco, Inc.*, 437 F. 2d 308; *Clark v. Texaco, Inc.*, 222 N.W.2d 52 (Mich. App. 1974).

It is of no consequence that the one holding the apparent authority (Faison) may not know he has it. Restatement, *Agency*, 2d, §8, Comment a. Nor is it of consequence that the representations of the principal were not made directly to Mabe alone.

> "The manifestation of the principal may be made directly to a third person, or may be made to the community, by signs, by advertising, by authorizing the agent to state that he is authorized, or by continuously employing the agent." Restatement, *Agency*, 2d, §8, Comment b.

Here, there was ample evidence that Faison, as an individual business person, was so obscured by the ostentation of advertising B.P.'s trademark that he appeared to be nothing more than B.P.'s servant.

## Reliance

The testimony of Claude J. Mabe heretofore set forth exhibits evidence of sufficient reliance upon the B.P. representations to indicate that, but for those representations, he would have patronized another more convenient station. Thus, there is evidence that he acted to his detriment by bypassing a station, where we must assume no negligent act would have occurred, in reliance on the manifestations of agency held out by appellee. But the testimony went even farther. Presumably to meet the prerequisite of proof that it was reasonable for the third person (Claude J. Mabe) to rely on the representations, Restatement, *Agency*, 2d, §8, Comment c, appellant's brother testified without objection:

> "Q How did you ascertain that this was a BP station?

A Well, like I said before, as we normally deal with BP. My brother deals at it because he lives right around the corner. There was a large BP sign on the pole hanging right over the gas station. There was a numerous amount of BP signs, BP cans. The service attendant was dressed in BP clothes, hat, green jacket, with BP signs on it — him. And you know, we had no idea of nothing, that it wasn't a BP station because like we normally deal at BP and if we know that it wasn't owned and operated by BP management, probably wouldn't even have went there because we like their service and things of that sort.

Q Was there a display of BP oil?

A Yes, there was. On the island where the gas is, there is a display of BP cans of oil and stuff like that.

Q Did you see another gas station nearby?

A Yes, there was a Exxon directly across the street which would have been more convenient for us to pull into than the BP because we did have to cross traffic and at that time our car was on hot and it would have been more logical for us to go to Exxon since our car was on hot, but knowing that we deal at BP and we normally get the service that we go in and ask for, we wait until traffic cleared for us to go across the street to the BP gas station."

He also indicated that he associated certain colors with the B.P. Corporation:

"Green and yellow is the colors BP has."

Appellant's father's testimony also went to the reasonableness of appellant's reliance on the apparent operation of the station by B.P.:

"Q And there wasn't any question in your mind, was there, that it was a BP station?

A No, sir, there's no question in the world

because they had their signs out and I deal right today with BP, Brooklyn BP, because they give me good service and I go there, Brooklyn, right now and do my — I trade with them."

Thus, sufficient evidence was generated of Mabe's reliance on B.P.'s manifestations of agency for that element to be presented to the jury and it was for the jury to decide whether such reliance was reasonable.

## Conclusion

Recognizing that much of the testimony was contradicted by appellee, we can hardly conceive a more elementary showing of sufficient evidence of representation and reliance to provide a jury question. It is not our role to believe or disbelieve the evidence. We find only that there was clearly enough evidence for a jury to consider, and if believed, to decide that B.P. Corporation represented that the operator of the station was its servant or agent, thereby causing Claude J. Mabe justifiably to rely upon the care and skill of such apparent agent, subjecting it to liability to Mabe for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such. Restatement, *Agency*, 2d, §267, *supra.*

We well recognize the significance of this result. We are aware also that traditionally oil companies have been protected from liability by reciprocal leases and simultaneous dealer agreements which have provided a moat between the company and its "independent" operator which could not be bridged by *actual* agency, express or implied.[5] The use of apparent agency to ford that moat is at best an "emerging doctrine", Comment, *Liability of Oil Company for Its Lessee's Torts*, 1965 Ill.L.F. 915, and is not always accepted by courts when it has been offered. See, *e.g., Sherman v. Texas Company*, 165 N.E.2d 916, 917 (Mass.); *Reynolds v. Skelly Oil Co.*, 287 N.W. 823 (Iowa) and

---

5. See, *e.g.,* Smith v. Cities Service Oil Company, 346 F. 2d 349; Miller v. Sinclair Refining Co., 268 F. 2d 114; Texas Co. v. Wheat, 168 S.W.2d 632 (Tex.).

*Coe v. Esau,* 377 P. 2d 815, 818 (Okla.). If the facts of this case warrant consideration by a jury of B.P.'s liability under the doctrine of apparent agency, it is of no consequence that some of the facts may have been presented by appellant to prove an actual agency. It is sufficient that there were facts before the jury from which they could have found an apparent agency pursuant to the instructions of the court.[6]

Upon deciding to grant the motion for judgment n.o.v., the trial judge noted there was insufficient evidence of actual agency to provide a jury question. However, the insufficiency of the evidence of an apparent agency was not the reason for his decision in that regard. He explained his decision to enter judgment n.o.v. because he did not "find this case as one of apparent authority or agency by estoppel" because:

> "To hold so, it would mean anytime any franchise dealer would allow his product to remain on the premises of an individual, let the individual use his

---

6. The court instructed:

> "Now, if you should find from the evidence that the service station in question displayed sufficient signs, implements, products, uniforms, and other items of BP designation such that the plaintiff would wrongfully assume from the appearance of such station that it was under the control of and that the operators were agents or servants of BP Oil Corporation; if you further find from the evidence that the plaintiff dealt with BP designated service station with some frequency in the past, that they were the type of station on which he had come to reasonably rely because of his familiarity and general satisfaction with their operations on prior occasions, and if you find that the plaintiffs entertained a reasonable expectation that there would be general uniformity of quality in respect to products and service in all BP designated stations, and if you further find from the evidence that plaintiff was induced to enter the station in question because BP Corporation held such station out to the general public as — and gave it the outward appearance of a station under its control, and if you further find that plaintiff's reliance upon such holding out and such general appearance was reasonable under the circumstances, taking into consideration all the testimony and all the evidence in this case, then such facts may be sufficient to justify your finding that Lonnie Faison was operating said station as its agent or servant of the defendant, BP Oil Corporation, and you must so find regardless of whether there is evidence tending to show, as between BP and Lonnie Faison, there is not actually a contractual relationship of principal and agent."

national advertising, emblems, et cetera, that this act in itself would create an agency by estoppel, which would mean that every nationwide dealer, the minute they put their advertising paraphernalia in a mercantile business would be subjecting himself to suit. I don't think this is the intention of the law."

That, of course, is a misleading oversimplification. There is a vast difference in advertising as a franchise dealer that certain products are available on the premises, and advertising *by* the producer as if the national corporation under whose name the product is retailed is responsible for the safe operation of its retail outlets.[7] The facts of this case show that B.P. overtly represented itself as the principal of the operator of the station by almost every known advertising technique to the total exclusion of any indication of control by anyone else. Not only did it see to it that their uniformly recognizable colors and trademark were visible throughout the station, it made no effort during periodic inspections of the station to make sure that the actual independent operator relationship was made public. All of this was done to enhance the sales of its product, and, having profited thereby, B.P. can hardly decry responsibility therefor. Where a corporation ostensibly has held itself out to the public as the operator of a service station, public policy requires that it bear the responsibility not simply for the quality of its product, but for its proper and safe delivery as well.

## Insufficient Damage Award

The appellant also argues that the trial judge erred in not granting a new trial on the ground that the $2800.00 was substantially less than the damages proven by appellant. In *White v. Parks*, 154 Md. 195, 203, it was explained that:

"The size of a verdict can only be given weight in

---

7. In fact, it has been held that franchisers of other than petroleum products may be held liable for torts of their franchisees based on apparent authority. See Singleton v. International Dairy Queen, Inc., *supra*.

this court in a comparatively restricted class of cases, where, if legal error is found in the rulings of the trial court, it becomes necessary to consider if the amount of the judgment is indicative of injury to appellant."

Such is not the case here. In the absence of legal error, we may not guess what a jury chooses to believe or disbelieve. The Court of Appeals in *Rephann v. Armstrong*, 217 Md. 90, 93, made it clear that:

"Almost never is the size of a verdict a matter for review by this Court . . . . The trial court refused a new trial sought on the ground that the verdicts were excessive, *and it is not our function or right, even were we disposed to do so, to pass on his action in this respect.* " (Emphasis added).

The discretion of the trial court was not abused in denying a new trial. *Safeway Trails, Inc. v. Smith*, 222 Md. 206; *Sauer v. Schulenberg*, 33 Md. 288, 289

Under Md. Rule 1075 a, we shall enter the judgment that ought to have been entered by the court below.

> *Judgment reversed.*
> *Judgment entered in favor of Claude J. Mabe for $2800 with interest from date of verdict and costs.*
> *Costs to be paid by appellee.*

*Powers, J., concurring:*

In the opinion written by Judge Lowe for this Court in reversing the judgment of the Superior Court of Baltimore City, we have applied that aspect of the law of agency which permits a finding that a party, by its own acts, has made it reasonably appear to another that one with whom he deals is the agent of the party creating the appearance.

I concur fully with the opinion, as well as in the result. What the Court's ruling in this case does is to hold that the

evidence admitted at the trial was sufficient to permit a jury, properly instructed on the law, to find that the acts of B.P. Oil Corporation made it reasonably appear to Mr. Mabe that the individuals serving customers at the station here involved were agents of that Corporation. I see in the reasoning of the opinion no departure from long recognized principles of law.

Courts may judicially notice certain facts of common knowledge, but judges must be careful to avoid holding that their personal knowledge, especially of business affairs, is the equivalent of common knowledge by a public generally unsophisticated in the ways of business management. I doubt very much that the average individual would be able, with legal specificity, to name the other party to a contract by which he buys a hamburger, a tank of gasoline, a muffler for his car, or has his tax return prepared, or rents a car, or a motel room.

The reason is quite clear, and undoubtedly arises from sound and effective business judgment. With respect to countless products or services the message is broadcast far and wide: Buy our product (or use our service) at any of our many places of business. The identity projected is the name identity of the product or the service, to the virtual if not the absolute exclusion of all others.

When such a policy of identity promotion is successful, and a customer is attracted to a place of business by its identifying name, signs, or symbols, simple justice entitles the customer to show that from those appearances, he reasonably thought he was doing business with the company whose identity was so projected.

*Melvin, J., dissenting:*

In concluding that the trial judge was wrong in granting defendant's motion for judgment n.o.v., I think the majority has misapplied well established principles of the law of agency to the evidence in this case. I, therefore, with due respect, dissent and state my reasons.

## I. THE LAW

### A.

The declaration filed on April 19, 1973, by the plaintiff, Claude J. Mabe, against B. P. Oil Corporation and Lonnie Faison, trading as Faison Service Station, alleged that the "service station [was] owned and under the direction of the defendant, B. P. Oil Corporation and operated by its agent Lonnie Faison . . . ." It is therefore clear that the only legal theory relied upon by the plaintiff to recover against B. P. Oil Corporation (hereafter sometimes called "the Company") is the doctrine of *respondeat superior*. It is not alleged that the Company was negligent in employing Faison, that it knew or should have known that Faison or his employees were unskilled or a danger to the public, that the Company negligently failed to maintain the premises in a safe condition, or that it directly in any other manner breached any duty it owed to the plaintiff. The sole issue here is the Company's responsibility for the negligence of Faison's employee in handing to the plaintiff a can of gasoline instead of water.

> ". . . All of the authorities agree that the rule of *respondeat superior*, which requires one person to answer for the acts of another, arises from the relation of principal and subordinate. *It only applies when the relation of master and servant, employer and employee or principal and agent is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong. It does not apply when the wrongdoer is an independent contractor, even though there be an agreement or 'arrangement' between him and the person who is claimed to be responsible for the wrong. Greer Lines Co. v. Roberts*, 216 Md. 69, 78, 139 A. 2d 235; 2 Mechem, *Agency* (2d Ed.), Section 1858." *Hoerr v. Hanline*, 219 Md. 420, 421 (1959). (Emphasis added.)

Thus, for the plaintiff to survive a motion for directed

verdict at the close of the evidence, there must appear *in the record* legally sufficient evidence for the jury to reasonably conclude that an agency relationship [1] existed between the Company and Faison. Unless such a relationship exists there is no predicate for the application of the doctrine of *respondeat superior* to impose vicarious liability upon the Company.

## B

Both parties to this appeal have by their briefs correctly assumed there are only two major types of agency relationship, both descriptive of the way in which the relationship is created. The first type is an *actual agency*. An actual agency may be created in two ways: *expressly* or *by implication*. Thus an *express agency* is formed by express agreement, oral or written. An *implied agency* is an agency created by inference from facts sufficient to justify the inference. An implied agency may be said to exist even in the face of a written or oral agreement between the parties that an agency does not exist. The key factor here seems to be the right of one party to control the day-to-day operations of the other party in the conduct of the subject matter in dispute.

The second type of agency, descriptive of the way in which the relationship is formed, is *agency by estoppel.* Paradoxically, this type of agency presupposes the

---

1. For purposes of this opinion the term "agency relationship" is used broadly to include not only a principal-agent relationship but master-servant and employer-employee relationships as well. It should be noted, however, that in legal contemplation the distinction between a servant and an agent who is not a servant "may be important in determining the liability of an employer for a tortious act of his employee". (A. & P. Co. v. Noppenberger, 171 Md. 378 (1937)); for "it is stated as a general rule that a principal is not liable for any physical injury caused by the negligent conduct of his agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal. In other words, a principal employing an agent to accomplish a result, but not having the right to control the details of his movements, is not responsible for incidental negligence while such agent is conducting the authorized transaction. 1 Restatement of Agency, Sec. 250." Henkelmann v. Insurance Co., 180 Md. 591 (1942).

*non-existence* of an actual agency, either express or implied. It is sometimes called "apparent" agency or "ostensible" agency and is said to exist in order to serve as a predicate for the application of the doctrine of *respondeat superior* in those situations in which it is considered inequitable to permit the "principal" to deny that an agency relationship really exists and thus escape liability for the tortious acts of his "agent".

I agree with the majority opinion that § 267 of the *Restatement of the Law, Agency 2d* (1958) sets forth in general the elements of proof necessary to establish agency by estoppel:

> "One who represents that another is his servant or other agent and thereby causes a third party justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

It would therefore appear that in order to hold the Company liable for Faison's negligence on the basis of agency by estoppel or apparent agency, the *record* must contain legally sufficient evidence from which the jury could have reasonably concluded that:

1) The Company "represented" that Faison was its servant or other agent; *and*
2) Such "representation" thereby caused appellant justifiably to rely upon Faison's care or skill.

## II. APPLICATION OF LAW TO THE EVIDENCE

The majority rests its decision on its holding that the evidence is legally sufficient for a jury to conclude that an "apparent agency" or agency by estoppel existed. I disagree.

### A. Representation of Agency Relationship

In order for the plaintiff to show that in going to Faison's gas station he relied on "representations" of an agency

relationship, there must, of course, be evidence that he had knowledge of the alleged representations at the time he claims to have relied on them. Obviously one can not rely on something of which he has no knowledge. In this case, therefore, the inquiry is: what "representations" by the Company that Faison was its agent was the plaintiff aware of when he decided to drive his car into the "Hilltop B P filling station"?

The *only* evidence in the record bearing on this question is contained in the plaintiff's testimony set forth in the majority opinion:

"Q Was there anything in particular you — attracted you to the BP station on Hilton Street?

A Nothing except for the BP station, had BP signs, BP gas, BP pumps.

Q Was there any sign up that said anything about being operated by anybody other than BP?

A No, sir."

The majority relies on other evidence in the record indicating that "the B.P. trademark was used in national and regional sales campaigns and in advertising in television and in periodicals" to support its view of "manifestations by the principal" of an agency relationship between the Company and Faison. In my view, this evidence, such as it is, is completely irrelevant to the issue to be decided. In the first place, there is not even a gossamer of evidence as to the content of the advertising. Presumably, it promoted the sale of "BP" products — just as the sale of any other brand name product might be promoted, e.g., "Ivory" soap. In the second place, there is likewise no evidence whatever that the plaintiff had any knowledge of, much less relied upon, any such advertising.

Thus, the only "representations" relevant to the issue of agency by estoppel.*in this case* are the signs and distinctive colors on the filling station premises. The weight of authority in other jurisdictions is that the display of distinctive colors and emblems, standing alone, is insufficient evidence of a representation of an agency

relationship between an oil company-lessor and an operator-lessee of a gasoline service station. A leading case on the issue is *Coe v. Esau*, Okla., 1963, 377 P. 2d 815, where it is stated:

"It may be stated as a general rule that tenancy alone will not render the landlord liable for the torts of his tenant. Neither the mere fact of ownership of property nor that goods marketed under the trade mark or trade name of the landlord are advertised and sold upon the demised premises is deemed sufficient to raise an inference that the tenant-vendor is the agent or employee of the landlord. (Citing cases). *It is indeed a matter of common knowledge and practice that distinctive colors and trade mark signs are displayed at gasoline stations by independent dealers of petroleum product suppliers. These signs and emblems represent no more than notice to the motorist that a given company's products are being marketed at the station.*" (Emphasis supplied.)

See also *Sherman v. Texas Company*, Mass. 1960, 165 N.E.2d 916, where a directed verdict for the oil company was affirmed in a case where the plaintiff sought to hold the oil company-lessor liable for injuries caused by an employee of the operator-lessee of a service station on the theory of "ostensible agency". The Supreme Judicial Court of Massachusetts said, at 917:

"We rule that the representation of the signs was confined to the statement that Texaco gasoline was sold at the station. We agree with the statement in Reynolds v. Skelly Oil Co., 227 Iowa 163, 171, 287 N.W. 823, 827, that it 'is a matter of common knowledge that these trademark signs are displayed . . . by independent dealers.' "

In *Crittendon v. State Oil Company*, Ill. 1966, 222 N.E.2d 561, another case in which tort liability of an oil company

was sought on the theory of agency by estoppel, the Appellate Court of Illinois said:

> "The signs alone might indicate that this service station sold State products, either to the exclusion of, or in preference to, other competitive brands. There may be service stations which carry on their premises only the name of a particular line of gasoline and oil products which they sell. However, we do not believe that the prominent display of such brand name or symbol alone, would necessarily warrant the assumption that such service station was being operated as an agency of the owner of the brand name or symbol. See: Trust Co. of Chicago v. Sutherland Hotel Co., 389 Ill. 67, 72, 73, 58 N.E.2d 860 (1945)."

See also *Apple v. Standard Oil, et al*, 307 F. Supp. 107 (N.D. Calif. 1969) and *Manis v. Gulf Oil Corporation*, 185 S.E.2d 589 (Ga. 1971).

In *Gizzi v. Texaco, Inc.*, 437 F. 2d 308 (1971), cited by the majority to support its holding regarding the "manifestation of authority" element of agency by estoppel, there was evidence that the signs involved contained the slogan "Trust your car to the man who wears the star" and that Texaco engaged in "substantial national advertising, the purpose of which was to convey the impression that Texaco dealers are skilled in automotive servicing, as well as to promote Texaco products, and that this advertising was not limited to certain services or products". In that case *the plaintiff testified that he was aware of the advertising engaged in by Texaco and that it had instilled in him a certain sense of confidence in the corporation and its products.*

In this case the signs which attracted Claude Mabe to the "Hilltop BP filling station" consisted of the letters "B" and "P" side by side on a yellow or green background. There is nothing in this record that Claude Mabe considered that it conveyed the message, as in *Gizzi, supra*, with Texaco, that the B. P. Oil Corporation was vouching for or inducing him to believe that Faison was its agent, servant, or employee.

Indeed, so far as this record is concerned there is not a whit of evidence that the plaintiff had ever heard of the B. P. Oil Corporation. In the circumstances, in my view, this is not enough to estop the B. P. Oil Corporation from asserting the truth, the truth being that Faison was an independent contractor over whom it exercised no day-to-day control in the operation of the filling station.[2] I agree with the appellate court of Iowa which said in *Reynolds v. Skelly Oil Company*, 287 N. W. 823 (1939), at 827:

> "The argument of appellee that the Skelly Oil Company was estopped because of the signs displayed and that, because of such signs, there was a presumption that the station was owned by the Skelly Oil Company has no support in reason or authority. As well argue that, because the word 'Chevrolet' or 'Buick' is displayed in front of a place of business, General Motors would be estopped to claim that it was not the owner of the business. It is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers."

See also *Apple v. Standard Oil, et al*, 307 F. Supp. 107 (N.D. Calif. 1969), where the Court said at 115:

> "Under these circumstances the mere fact that the station sold defendant's gasoline and displayed defendant's signs would not constitute a 'holding out' to Apple that the lessee-operator was defendant's agent or that Apple reasonably relied upon any representations of the defendant."

Based on the authorities cited, I would hold that the mere fact that the Company permitted its signs and distinctive emblems to be displayed on the premises is legally insufficient evidence of a representation that Faison was its

---

2. See Standard Oil Co. v. Gentry, 1 So. 2d 29 (Ala. 1941), cited by majority, and Miller v. Sinclair, 268 F. 2d. 114 (5th Cir. 1959) for holdings on facts similar to case *sub judice* that there was no actual agency, express or implied. See also 83 ALR 2d. 1296 and cases there discussed for similar holdings.

agent and certainly not enough to estop the Company from showing, as it has, that there was in fact no agency relationship, express or implied, between it and Faison.

## B. Justifiable Reliance

The majority asserts that "[t]he testimony of Claude J. Mabe heretofore set forth exhibits evidence of sufficient reliance upon the B. P. representations to indicate that, but for those representations, he would have patronized another more convenient station". As I have said, the *only* evidence in this record of any "representations" made by the Company *that were known to Claude J. Mabe* concerns the "BP" sign and symbols. Therefore, that is *all* he may arguably claim to have relied upon to support his contention that the Company is estopped to deny that Faison was its agent at the time Faison's employee was negligent.

Assuming, *arguendo*, that the sign and symbols "represented" that Faison was an agent of the B. P. Oil Corporation, it was incumbent upon the plaintiff to produce legally sufficient evidence that he was "*thereby*" caused to rely to his detriment upon the care or skill of Faison. I would agree that a jury could reasonably conclude that "but for" the large "BP" sign the plaintiff would not have driven into Faison's station. I would further agree that when the plaintiff decided to patronize the station, he had a right to expect that *whoever* operated the station would not cause him harm through tortious conduct. To that extent it may be said that he placed "justifiable reliance" upon Faison's care or skill — just as any customer of any other business would expect not to be harmed by negligent acts of the proprietor. But that is not to say, in the context of the law of estoppel, that it was necessarily the sign and symbols in this case that "caused" the plaintiff to rely upon Faison's care or skill. Expecting care and skill from the proprietor of a commercial business that caters to the public is not the same as being "caused" to rely upon that expectation by representations of the proprietor's "ostensible principal" that the proprietor is his "agent". To work an estoppel there must be a causal connection between the representations of agency and

reliance upon those representations. To establish a causal connection there must be evidence from the person claiming to have relied upon the representations that tends to show *why* he so claims; otherwise, the fact finder would have no basis for determining that the plaintiff really did rely upon the "agent's" care or skill, or that the claimed reliance was justifiable. If the evidence fails to show that the plaintiff relied at all upon the "agent's" care or skill or if the reasons given for such reliance are unrelated to the "principal's" representations of agency, the test (with which I agree) set forth by the majority for establishing an apparent agency or agency by estoppel has not been met.

In this case, by his own testimony, the plaintiff went to the gas station solely because he "needed gasoline and water". He said he chose the "Hilton BP filling station . . . [b]ecause I always buy BP gasoline, always deal with BP". In my opinion, that statement, without some explanation of *why* he "always buy[s] BP gasoline" or *why* he "always deal[s] with BP", is evidence only of the fact that he, like thousands of other motorists, had become accustomed to using one particular brand of gasoline, i.e., "B.P." The only explanation *in this record* of *why* the plaintiff "always deal[s]" with "BP" is found in the testimony of his brother who testified: "My brother [the plaintiff] deals at it [BP] because he lives right around the corner". He was referring to another "BP" station near the plaintiff's home. Thus, the explanation is that the plaintiff "dealt with" BP simply as a matter of convenience. There is simply no evidence of any other reason the plaintiff "always deals with BP". The reason given, so far as this plaintiff is concerned, is utterly unrelated to any "representation" by the B. P. Oil Corporation that Faison was its agent.

Finally, I would observe that the majority's assertion that "[w]here a corporation has ostensibly held itself out to the public as the operator of a service station, public policy requires that it bear the responsibility not simply for the quality of its product, but for its proper and safe delivery as well", could be interpreted as a holding, albeit by *dictum*, that the legal theory of "strict liability" for tort in product

liability cases should somehow be applied to the doctrine of agency by estoppel. It should be noted, however, that the Court of Appeals "has not, as yet, either rejected or accepted the 'strict liability' theory set forth in *Restatement 2d, Torts*, § 402A, in the type of case where that section might logically be applied". *Frericks v. General Motors Corp.*, 274 Md. 288, 298. Moreover, by the above quoted assertion the majority seems to be establishing a different test for the Company's liability than that espoused at the beginning of its opinion — one that would only require half of the two prong test set forth by § 267 of the Restatement of Agency, without regard for the "justifiable reliance" prong of that test. Such a "public policy test" was neither presented below nor argued on this appeal. In my opinion, the Court should not now consider it *ex mero motu*. Rule 1085.

I would affirm the judgment of the trial court.